UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

NOT FOR PUBLICATION

------------------------------------------------------------X

THOMAS MAZZA, JR.,                          :
                                            :
                          Plaintiff,        :   **MEMORANDUM**
                      - against -           :   **DECISION AND ORDER**
                                            :
DISTRICT COUNCIL OF NEW YORK AND            :   CV-00-6854 (BMC) (CLP)
VICINITY UNITED BROTHERHOOD OF              :
CARPENTERS AND JOINERS OF AMERICA,          :
                                            :
                          Defendant.        :
------------------------------------------------------------X

THOMAS MAZZA, JR.,                          :
                                            :
                          Plaintiff,        :
                      - against -           :   CV-01-6002 (BMC) (CLP)
                                            :
ANTHONY SENECA and CARLO SENECA,            :
conducting business under the name of C & A :
SENECA CONSTRUCTION,                        :
                                            :
                          Defendant.        :
------------------------------------------------------------X

**COGAN**, District Judge.

This is an action alleging wrongful termination of employment against the plaintiff's

former employer, C & A Seneca Construction (the "Company") and its principles, Anthony

Seneca, Carlo Seneca (the "Senecas"), and breach of the duty of fair representation against

plaintiff's Union, District Council of New York and vicinity United Brotherhood of Carpenters

and Joinder of America (the "Union"). Plaintiff also seeks to recover for non-payment of various

wages he is entitled to under state law, federal law, and as a third-party beneficiary of public

works contracts. Presently before the Court are defendants' motions for summary judgment. For

the reasons that follow, the motions are GRANTED in part and DENIED in part.

# BACKGROUND

## I. Procedural History

In October 2000, plaintiff, proceeding *pro se*, filed three actions in Richmond County Civil Court against the Union seeking damages for loss of the use of his property, loss of time from work, and breach of contract (the "Union case"). The Union removed the actions to this Court in November, 2000.

Plaintiff then filed a second action in this Court on September 5, 2001, again proceeding *pro se*, against his former employers, the Senecas and the Company (together, the "Seneca Defendants"), claiming breach of the collective bargaining agreement ("CBA"), violations of the Fair Labor Standards Act ("FLSA"), New York State Labor Law ("NYSLL") and prevailing wage provisions of public works contracts to which the Company was a party.

On September 19, 2002, plaintiff filed an amended complaint in the Union case. On August 5, 2003, he filed an amended complaint in the Seneca Defendants case. Then, in February of 2004, plaintiff retained counsel. During the brief period of time that plaintiff had counsel, his attorney sought to consolidate the two cases and file a consolidated amended complaint. On February 23, 2004, Judge Sterling Johnson, Jr. obliged and entered an Order consolidating the cases.[1] The next day, Magistrate Judge Pollack granted plaintiff leave to have his attorney file a new motion for leave to amend his complaints again.

Although nowhere reflected on the docket, plaintiff's counsel filed a motion for leave to amend and a proposed consolidated amended complaint against all defendants. Judge Pollack [112] recommended granting the motion to amend except as to plaintiff's proposed negligence

---

[1] This case was reassigned to me in August, 2006.

and RICO claims. Judge Johnson adopted that recommendation by [119] Order dated March 16, 2005.

Almost immediately after this Order, plaintiff's counsel withdrew and plaintiff resumed representing himself. To date, plaintiff has not filed a consolidated amended complaint conforming to Judge Johnson's March 16, 2005 Order. There is no indication from the docket that any of the defendants called this failure to either the Court's or plaintiff's attention.

It appears that the first time this failure was pointed out was in defendant Union's moving papers on the present motion. The Union notes candidly that it is "not entirely sure which complaint the plaintiff is relying upon," but that it will "give plaintiff the benefit of counsel's services and proceed as if the relevant pleading is the one which counsel drafted for him." The Seneca Defendants, for their part, ignore the existence of the proposed consolidated complaint.

In his opposition, plaintiff explains that he intended and believed that the proposed consolidated amended complaint was the operative complaint and that, because he is *pro se*, he did not know that he had to file a conforming complaint. Plaintiff also offers to file a conforming complaint, should the Court deem that appropriate.

Because plaintiff is *pro se*, was never directed to file a conforming complaint and because the defendants each had ample reason to know, despite this technicality, that the amended consolidated complaint (with the exclusions recommended by the Magistrate Judge) was the operative complaint, I deem it to be the operative complaint except that I strike the Fifth and Tenth claims for relief, i.e., the RICO and negligence claims.[2] Operating from this complaint will not prejudice any defendant; in fact, it frees the Seneca Defendants from arguing

---

[2] See e.g., Allen v. City of New York, No. 02 Civ. 4373, 2005 U.S. Dist. LEXIS 95802 (S.D.N.Y. Mar. 28, 2007); Vero v. Barnett, No. 04 Civ. 2778, 2005 U.S. Dist. LEXIS 44133 (M.D. Fla. Apr. 6, 2005); Miller v. Publishers Paper Co., No. 85-1816, 1986 U.S. Dist. LEXIS 20162 (D. Ore. Sept. 19, 1986).

for the dismissal of the negligence claim, which was included both in the last complaint against

the Seneca Defendants and the proposed consolidated complaint. Otherwise, the consolidated

complaint alleges substantially the same claims against the Seneca Defendants as the prior

complaint did:

1. Unpaid overtime pursuant to FLSA § 206 and 207;
2. Unpaid overtime, supplemental wage and/or "call-in pay and laundry/uniform allowance pursuant to NYSLL;
3. Breach of implied contract to pay prevailing wage for work performed on public works projects;
4. unpaid prevailing wage and Union wage in breach of contracts for which plaintiff was a third party beneficiary, i.e., the collective bargaining agreement and the Company's public works contracts;
5. Struck (Negligence);
6. Retaliatory discharge in violation of the FLSA;
7. Retaliatory discharge in violation of NYSLL;
8. Discharge without cause and failure to pay Union wage in violation of the CBA;
9. Breach of duty of fair representation; and
10. Struck (RICO).

For these alleged wrongs, plaintiff seeks the following relief: (1) compensatory damages;

(2) back pay, forward pay, and unpaid benefits; (3) punitive damages; (4) unpaid supplemental

wage, overtime, prevailing wage, Union wage and benefits; (5) liquidated damages under the

FLSA and NYSLL; (6) an injunction restraining defendants from violating § 215 of the NYSLL;

(7) reinstatement with preservation of seniority and pay for lost compensation; (8) declaratory

judgment that the Union breached its duty of fair representation; (9) attorney's fees, costs, and

pre and post-judgment interest; and (10) such other and further relief as the Court deems just.

## II. Factual Allegations

### A. Plaintiff's Employment Leading Up To June 5, 2000

Plaintiff began working for the Company some time in 1998. Plaintiff claims he worked as a "carpenter foreman" and his duties at times included interviewing, hiring and firing employees as well as doing carpentry and other work. The Company alleges that he was hired as an unskilled non-union laborer who mostly did painting work on various job sites, but qualifies this description by admitting that on some occasions plaintiff acted as foreman and took part in decisions relating to personnel. Overall, the record supports plaintiff's assertions that he at times did work as a foreman and that he performed some carpentry, in addition to other work.

It is undisputed that around this time, the Company was a signatory to a Collective Bargaining Agreement ("CBA") with the Union that was in force at least between 1999 and 2001 and covered Union members who worked as carpenters on a construction project located at 80/100 Jerome Avenue in Staten Island (the "Holy Rosary" project). This was one of four publicly funded projects on which plaintiff worked. Defendants jointly assert that the CBA was limited to this single project and this time period. Plaintiff, however, asserts that the CBA was in effect from July 1, 1996 to June 30, 2001 and was not limited to the Holy Rosary project, but rather covered all carpentry work within a set region.

There are two partial agreements and one apparently complete agreement in the record, all of which plaintiff has provided. The complete agreement specifically lists the Company as a party to the agreement on the cover. The cover also indicates that the contract was active from July 1, 1996 to June 30, 2001. These dates, however, are contradicted by the dates on the signature pages – the only complete signature pages in the record – which provide that the agreement was signed some time between July 22, 1999 and August 12, 1999. These conflicting

dates may be partially explained by the "Retroactivity" provision of the agreement (Article XX), which provides that "all wages, fringe benefits and conditions provided for in this Agreement shall be retroactive to July 1, 1996." Article XX, however, is contradicted in turn by the preamble on page one of the agreement that defines the Agreement as "made and entered into this 1st day of July, 1996 and effective as of 22nd July, 1999." Neither the Company nor the Union has explained these discrepancies except to make the conclusory statement that the agreement was in force only from 1999 to 2001. Therefore, making all reasonable inferences in favor of plaintiff, I must assume that the contract was in force from July 1, 1996.

The question of what work the CBA covered is no more clear from the record than its operation dates. Defendants jointly state, without elaboration, that the agreement only applied to the Holy Rosary project. But, again, plaintiff correctly points out that this conclusion is not supported by the language of the CBA. According to its terms, the CBA applies to all "covered work performed by Carpenter Employees within the territorial jurisdiction of the [Union.]," encompassing all of New York City and a portion of Long Island. Again, in light of the Rule 56 standard, I must assume that the CBA extended to all covered work performed for the Company within this region.

Finally, it is undisputed that the CBA provided for a grievance and arbitration procedure to resolve any disputes and that it required non-Union workers performing covered work to become Union members within 7 days.

At various times from about January 2000 to June 5, 2000, the day plaintiff was terminated, he performed work at the Holy Rosary project. The Company asserts that plaintiff was employed on that job as a part time painter, but admits that, at some point, plaintiff may have performed carpentry work. Anthony Seneca's affidavit in support of the Company's

motion explicitly states that on the morning of June 5, 2000, he met with plaintiff because it had come to his attention that plaintiff was performing carpentry work at Holy Rosary in violation of the CBA. Likewise, Christopher Wallace, the Union President and Business Agent, admits that he was aware that there were some non-union individuals, who he now knows to have included plaintiff, who had been performing covered work at Holy Rosary.

Plaintiff alleges that he was performing covered work and was running non-union crews on nights and weekends. On several occasions, Union officials witnessed plaintiff performing covered work. Plaintiff admits to being approached three separate times prior to obtaining a Union card, twice by Union stewards and once by Mr. Wallace himself, and advised that he had to obtain a Union card to perform covered work. These instances occurred during the short stretches that plaintiff was assigned to Holy Rosary, first when they were pouring foundation, then again when he returned to do some of the framing and again before he was terminated. After each incident, plaintiff approached the Senecas to advise them that he had been instructed to obtain a Union card. Plaintiff felt that a Union card was like any other material necessary to perform the work and, therefore, his employer should pay for it. According to plaintiff, the Senecas said they would take care of it, but failed to do so.

The morning of June 5, 2000, plaintiff finally determined to obtain a Union card because the Senecas had not followed through on their statement that they would take care of it. According to Mr. Wallace, plaintiff had called to inform him about his non-union activities at Holy Rosary. Mr. Wallace testified that he asked plaintiff to come in and speak with him and reiterated that he had to obtain a Union card. Plaintiff does not recall if he spoke to Mr. Wallace before obtaining his Union card that morning, but does recall that Mr. Wallace was there and

7

followed him out when he left to return to the job site. Mr. Wallace testified that he followed

plaintiff to Holy Rosary in order to investigate the non-union work that plaintiff had described.

### B. The Events of June 5, 2000

After leaving the Union offices, plaintiff, driven by his wife, arrived at the Holy Rosary

location, where he approached the Senecas as they stood in front of the work area. The record

contains as many version of the conversation that ensued as people involved in it.

According to plaintiff, the first thing he did was hand Anthony Seneca his Union card and

demand reimbursement of the $500 it cost to obtain. At the same time, Carlo Seneca began

explaining to plaintiff that the Company had rehired a painter that plaintiff had fired. Plaintiff

admits to telling the Senecas that "there is no way that [the painter] is working on this job." The

trio continued to discuss the painter when Mr. Wallace joined the group and announced that

plaintiff was the new shop steward on the job. At this point both Senecas became very upset

with plaintiff and began shouting and cursing at him and threw him off the property, effectively

terminating him.

Plaintiff supports his version by describing various other situations in which he had

work-related disagreements with the Senecas and had not been fired. He also explains that

because he performed some foreman duties, conversations relating to personnel decisions were

not uncommon. Finally, he asserts that Mr. Wallace's declaration that he was the new shop

steward was an attempt to use plaintiff against the Senecas as part of an ongoing dispute between

the Company and the Union, something Mr. Wallace denies. In support of this allegation,

plaintiff points to a letter sent by Mr. Wallace to the Senecas, dated September 27, 1999,

threatening to remove all Union members from the project because of the Company's

delinquencies in making benefit payments. Plaintiff contends that it was Mr. Wallace's interjection that plaintiff was the new shop steward that got him fired.

According to Mr. Wallace, when he arrived at the location he witnessed plaintiff already engaged in a shouting match with the Senecas and waiving his Union card about a foot away from Anthony Seneca's face in a "threatening" manner. Wallace tried to intervene, but saw it was futile. Moreover, plaintiff did not appear to want his help. Therefore, Wallace continued on into the work area and proceeded with his investigation of plaintiff's claims by interviewing the shop steward and other workers.

According to Anthony Seneca, he and his brother were meeting with plaintiff that morning in order to "attempt to resolve a labor dispute," concerning plaintiff's improper performance of covered carpentry work on the Holy Rosary project. Anthony also wanted to discuss plaintiff's termination of a painter without authorization. Anthony advised plaintiff that the painter had been reinstated. Plaintiff responded, according to Anthony, that "he [plaintiff] would not work with that painter and refused to go to work." Anthony testified that he gave plaintiff a choice, go to work or go home. When plaintiff opted to go home, he was terminated. Anthony makes no mention of a Union card or of Mr. Wallace's presence or involvement.

Carlo Seneca, on the other hand, focuses entirely on plaintiff's Union membership. According to Carlo's deposition, plaintiff came to the job that morning stating that he was "the new shop steward and tried throwing the Union stop[sic] steward off the job." Carlo also testified that plaintiff was not, in fact, terminated that day. He was only asked to leave the work area. It was when plaintiff failed to returned to work that he was terminated.

At this stage of the case, I am obligated to take plaintiff's version of the events of that morning as fact.

## C. Events Following Termination

Following his termination, plaintiff approached Mr. Wallace about pursuing claims against the Union. Mr. Wallace told plaintiff that there was nothing the Union could do to get plaintiff reinstated, but that the Union would help him find other work and look into any unpaid wages for his last week of carpentry work at the Holy Rosary project.

Mr. Wallace was the Union representative who made the determinations as to what employee grievances would be pursued with the Company. With regard to plaintiff's termination, Mr. Wallace determined that, based upon his own observation and participation in the events of June 5, 2000, the Union did "not have a reasonable basis for filing a grievance, much less going to arbitration based on [plaintiff's] conduct."

With regard to plaintiff's wages, Mr. Wallace first questioned plaintiff with regard to his claims and then interviewed the shop steward and other workers on the project. He also personally viewed the project and determined that plaintiff's claims were exaggerated. His investigation revealed that it was not likely that plaintiff headed up non-union crews performing covered worked on nights and weekends away from the observation of shop stewards. He noted that there had been so little progress made on the project that it was unlikely that extra crews had been performing work. He also determined that plaintiff mostly performed work that was not covered by the CBA, but that he did, nonetheless, perform some covered work.

Based on this investigation, Mr. Wallace decided that all he could prove was 56 hours of carpentry work. He approached the Senecas with a demand for back wages and benefits owed to plaintiff based on that amount of time. Initially, they agreed to pay it. When they failed to do so after several weeks, Mr. Wallace filed a formal grievance on August 2, 2000.

By notice dated August 17, 2000, the Union's Grievance Committee set the first grievance hearing for September 7, 2000. A copy of the notice was sent by certified mail to plaintiff. The Notice contained a request for documents supporting the claim to be submitted in advance of the hearing. In response, plaintiff sent a letter, dated August 19, 2000, refusing to provide any of his documentation without outside legal advice and reiterating his desire to have the Union seek a broader grievance against the Company including his unlawful discharge claim and Union wages for his entire employment. The Company either did not appear or was not available on September 7, 2000. Plaintiff was the only one to appear. As a result, the hearing was reset for September 26, 2000. An updated notice was mailed to plaintiff.

During this time, plaintiff claims to have had additional difficulties with the Senecas. Plaintiff had apparently been renting an apartment from them at a below-market rate and was, among other things, subsequently sued by the Senecas in landlord/tenant court. Plaintiff had also gone on the offensive and begun filing complaints with various entities and courts including the IRS and the National Labor Relations Board ("NLRB"). As part of these other proceedings, plaintiff was in contact with the Company's attorney, Mr. Cotter. The Union was not aware of these discussions. Right before the September 26, 2000 grievance hearing, plaintiff met with Mr. Cotter at his office to discuss the settlement of all the claims between plaintiff and the Senecas. The settlement fell through when plaintiff refused to sign a release.

Plaintiff, his father, Mr. Wallace and other Union agents were present on September 26, 2000 at the grievance hearing. The Company also appeared. Despite seeking the Union's representation in connection with his claims, plaintiff alleges that he was not aware that the Union was representing him at the hearing as opposed to the Company or itself. When a call was

11

made for supporting documentation, plaintiff indicated he had some but did not turn it over. This visibly upset Mr. Wallace, to whom he had previously refused to provide documentation.

The Company and the Union discussed a settlement of the grievance that would pay the same amount that was eventually recovered. The only requirement was that plaintiff fill out an IRS W-4 form. Plaintiff refused, stating that he had filled one out when he began his employment. Because the grievance was not resolved at the hearing, the Union filed a demand for arbitration on November 2, 2000. The Arbitration hearing was set for December 4, 2000.

At the arbitration, plaintiff was represented by two Union officials as well as Union counsel. After a hearing, the parties were able to agree on the hours and amount owed. This was incorporated into the arbitrator's Consent Award. The award required plaintiff to fill out an IRS W-4 form, which he did. Plaintiff was awarded wages and benefits totaling $3,025.68. Plaintiff admits that he accepted the award and did not raise any objections to it.

After a short delay, during which Union counsel assisted plaintiff, on January 3, 2001, the Company issued two checks that, along with tax withholdings of approximately $411.27, totaled the awarded $3,025.68. Plaintiff was not satisfied with the speed of the Company's compliance nor with the Union's efforts, nonetheless, both plaintiff and the Union benefit fund received their respective checks.

### D. NLRB Proceedings

On June 20, 2000, just 15 days after he was terminated and 12 days prior to the Union filing a grievance on plaintiff's behalf for unpaid wages, plaintiff filed a charge against the Company with the NLRB. The charge alleged that the Company had terminated plaintiff in

retaliation for him joining the Union, refused to pay him his last week's wages and had threatened him with bodily harm and eviction.

By letter dated September 28, 2000, the NLRB Regional Director dismissed plaintiff's charge on the grounds that plaintiff was employed as a supervisor within the meaning of § 2(11) of the NLRA and therefore was not entitled to the protections of the statute. Plaintiff's appeal to the Office of Appeals was denied by letter dated November 29, 2000.

On October 5, 2000, well after the Union had commenced grievance proceedings against the Company on plaintiff's behalf, plaintiff filed a second charge with the NLRB, this time against the Union. The charge alleged that the Union had failed to adequately represent plaintiff in connection with his June 5, 2000 discharge and the employer's failure to pay Union wages for three months during which he worked a Union job.

By letter dated November 27, 2000, the NLRB Regional Director dismissed plaintiff's charge on the basis that there was no evidence that plaintiff performed enough covered work to be eligible for contract wages and that plaintiff had been fired for insubordination. Additionally, the Regional Director found that the Union had been representing plaintiff in good faith with regard to his unpaid wages grievance despite plaintiff's non-cooperation. Plaintiff did not appeal this determination. He testified that he believed an appeal would be futile.

## DISCUSSION

Plaintiff's complaints state several claims against the defendants, the main one being a "hybrid" § 301-duty of fair representation claim against the Union and a breach of the CBA by the Seneca Defendants. To prevail on these claims, plaintiff must demonstrate both (1) that the Union breached its duty of fair representation; and (2) that the Company breached the CBA. See

e.g., Sanozky v. Int'l Ass'n of Machinists & Aero. Workers, 415 F.3d 279, 282 (2d Cir. 2005). Plaintiff also states claims for unpaid overtime under the FLSA and NYSLL, failure to pay the prevailing wage on City funded projects, and failure to pay a supplemental wage pursuant to NYSLL. Defendants largely ignore these claims. Finally, plaintiff also alleges a retaliatory discharge claim.

The Seneca Defendants' submissions on the motion are confusing at best and of little help to the Court. For example, they have labeled their motion as one for "summary judgment," but in argument claim to move in part pursuant to Fed. R. Civ. P. 12(b)(6). As the Seneca Defendants have already answered plaintiff's prior amended complaint, Rule 12(b)(6) is no longer available to them. Defendant could have moved for judgment on the pleadings pursuant to Rule 12(c), however, given the extensive discovery in this action to date and defendants' reliance on such discovery, I focus on their arguments for summary judgment under Rule 56 and ignore the Rule 12(b)(6) portion of their motion. See Global Network Communications, Inc. v. City of New York, 458 F.3d 150, 154-55 (2d Cir. 2006) ("[i]f ... matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment") (quoting, Fed. R. Civ. P. 12(b)) (alteration in original). Defendant Union also moves pursuant to Rule 56.

Federal Rule of Civil Procedure 56 provides that summary judgment is warranted where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Andersen v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510 (1986). Once a

moving party has met its initial burden to demonstrate that no genuine issue as to any material fact exists, the nonmovant "must come forth with evidence sufficient to allow a reasonable jury to find in their favor." Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001). "Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment." Zdziebloski v. Town of Greenbush, 336 F.Supp.2d 194, 201 (N.D.N.Y. 2004) (citing Carey v. Crecenzi, 923 F.2d 18, 21 (2d Cir. 1991)). Nonetheless, in determining whether genuine issues of fact exist, I am required to "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought... ." Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004).

**I. Subject Matter Jurisdiction**

The Seneca Defendants also move in part pursuant to Fed. R. Civ. P. 12(b)(1) challenging this Court's subject matter jurisdiction. The Company's arguments are puzzling in light of the record before me. They seem to assert that this Court's jurisdiction is based solely on plaintiff's FLSA claims and that the only remedy plaintiff seeks pursuant to the FLSA is an injunction. Neither of these assertions is correct. Even more confusing is the Company's argument on reply – that "[t]he plaintiff offers no facts establishing that Seneca was engaged in project [sic] funded by the United States, or that any work he performed for Seneca was subject thereof." (Seneca Defendants' Reply at 3). In support of this misplaced argument, counsel cites incorrectly to an Eleventh Circuit case addressing 42 U.S.C. § 1983 claims by police officers against their employer for violations of their rights to free speech, due process, equal protection and freedom of association. None of this seems to have anything to do with this case.

In order to clearly set out the basis for the Court's jurisdiction, I will liberally construe defendants' motion to question whether the Company's business sufficiently touches upon interstate commerce to fall within the reach of the FLSA.

First, the FLSA covers any employee who "in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 207. Unlike the § 1983 case cited by defendants, the FLSA does not have a state actor component. The law is clear that the reach of the FLSA extends to "local businesses 'whose employees use materials which have at some point moved in interstate commerce.'" Rosso v. PI Management Assoc., L.L.C., No. 02 Civ. 1702, 2005 WL 3535060, * 7 (S.D.N.Y. Dec. 23, 2005) (quoting Marshall v. Baker, 500 F.Supp. 145, 149 (N.D.N.Y. 1980)). The Seneca Defendants do not dispute that they are in the construction business, which necessitates the use of both tools and materials that have invariably traveled in interstate commerce.

Second, plaintiff's FLSA claims are not the only ones over which this Court has original jurisdiction. I also have jurisdiction over plaintiff's "hybrid" §301–duty of fair representation and breach of collective bargaining agreement claim. Sanozky, 415 F.3d at 282. "Such a suit, as a formal matter, comprises two causes of action. The suit against the employer rests on § 301 [or 29 U.S.C. § 185(a)], since the employee is alleging a breach of the collective bargaining agreement. The suit against the Union is one for breach of the Union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act." DelCostello v. International Broth. of Teamsters, 462 U.S. 151, 164, 103 S.Ct. 2281, 2290 (1983). Thus, this Court also has jurisdiction pursuant to federal labor law as well. Moreover, since the Court has original jurisdiction over at least one of plaintiff's claims, it has supplemental

jurisdiction over the rest of them, since they all arise out of the same series of events. See 28 U.S.C. §1367.

## II. Collateral Estoppel

Next, the Seneca Defendants ask this Court to give the NLRB proceedings described above and the Consent Award of the arbitrator preclusive effect and dismiss all of plaintiff's claims on that ground.

With regard to the NLRB proceedings, the Seneca Defendants again fail to cite any relevant case law. This may be because the law of this Circuit is clear that an NLRB Regional Director's determination not to issue a complaint has no preclusive effect on subsequent litigation. Local Union No. 38, Sheet Metal Workers' Intern. Ass'n, AFL CIO v. Hollywood Heating & Cooling, Inc., 1 Fed. Appx. 30, 34 (2d Cir. 2001) ("the decision of the NLRB regional director not to bring unfair labor practice charges has no collateral effects in federal court"); Local One, Amalgamated Lithographers of America v. Stearns & Beale, Inc., 812 F.2d 763, 767 (2d Cir. 1987) (same); Fleming v. Neptune World Wide Moving, Inc., No. 89 Civ. 6106, 990 WL 180553, *2 n. 1 (S.D.N.Y. Nov. 15, 1990) ("[t]he NLRB's decision not to file a complaint has no res judicata effect 'as it is not a final decision on the merits'") (quoting, Peltzman v. Central Gulf Lines, 497 F.2d 332, 334 (2d Cir. 1974)).

With regard to the Consent Award, however, plaintiff's claims are partially barred by the doctrine of claim preclusion. Arbitration awards, like court judgments, can be given preclusive effect. See Trustees of the Ala-Lithographic Indus. Pension Plan v. Quality Color Graphics, Inc., No. 99 Civ. 11795, 2001 WL 274266, *2 (S.D.N.Y. March 20, 2001) (citing Benjamin v. Traffic Exec. Ass'n Eastern Railroads, 869 F.2d 107, 110-14 (2d Cir. 1989)). The Consent Award of an arbitrator is like a consent judgment. "The entry of a consent judgment has a preclusive effect."

17

Monahan v. New York City Dept. of Corrections, 214 F.3d 275, 286 (2d Cir. 2000) (finding Union members' claims precluded by prior consent judgment issued in case involving Union and employer). Therefore, plaintiff is barred from relitigating his CBA wage claims for work performed on the Holy Rosary project in May and June of 2000.[3]

This is a small victory for the Seneca Defendants as it only takes care of the proverbial "tip of the iceberg."

## III. Duty of Fair Representation

Because establishing the Union's breach of its duty of fair representation is a prerequisite to consideration of the breach of the CBA claims against the Seneca Defendants, I address it as a threshold matter. Diem v. Central Suffolk Hosp., 234 F.3d 1261, *1 (2d Cir. 2000) (table). "A breach of the statutory duty of fair representation occurs only when a Union's conduct towards a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." Vaca v. Sipes, 386 U.S. 171, 190 (1967). "A Union's conduct can be classified as arbitrary only when it is irrational." Marquez v. Screen Actor's Guild, Inc., 525 U.S. 33, 46, 119 S.Ct. 292 (1988); see also Caputo v. Nat'l Ass'n of Letter Carriers, 730 F.Supp. 1221, 1226 (E.D.N.Y. 1990). In other words, "a Union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the Union's actions, the Union's behavior is so far outside a wide range of reasonableness as to be irrational." Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 67, 11 S.Ct. 1127 (1991) (citations and internal quotation marks omitted).

---

[3]  Whether the award has been satisfied is a different question from whether it precludes litigation of the amounts owed. Documentary evidence shows that plaintiff was awarded wages and benefits totaling $3,025.68. The checks paid out by the company totaled $2,614.41. This is a deficit of $411.27. The Company asserts that this amount represents proper income tax withholdings. The Court cannot make a factual determination of this question on the present record.

A Union can also breach its duty where it acts in bad faith. "Bad faith," encompasses fraud, dishonesty and other intentionally misleading conduct. See White v. White Rose Food, a Div. of DiGiorgio Corp., 237 F.3d 174, 179 (2d Cir. 2001) (citing Sim v. New York Mailers' Union No. 6, 166 F.3d 465, 472 (2d Cir.1999) and Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir.1998)).

"Proof of mere negligence or errors of judgment on the part of the Union is insufficient [to prove a breach of the duty of fair representation].... As long as the Union acts in good faith, courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular advantage [sic]." Cook v. Pan Am. World Airways, Inc., 771 F.2d 635, 645 (2d Cir. 1985), cert. denied, 474 U.S. 1109, 106 S.Ct. 895 (1986), abrogated on other grounds by Lorance v. AT & T Tech., Inc., 490 U.S. 900, 109 S.Ct. 2261 (1989). Accordingly, a Union does not breach its duty of fair representation when it "fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance." Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1153-54 (2d Cir.1994); see also Wozniak v. Int'l Union, United Automobile, Aerospace & Agricultural Implement Workers of America-UAW, 842 F.2d 633, 636 (2d Cir. 1988) ("There is no arbitrariness in failing to process a bad case.") (citing Fristoe v. Reynolds Metals Co., 615 F.2d 1209, 1214-15 (9th Cir. 1980)).

Additionally, to succeed on a claim for breach of the duty of fair representation, a plaintiff must not only establish the arbitrariness or bad faith of the Union's actions, but must also demonstrate a causal connection between the Union's wrongful conduct and his injury. Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. 1998).

19

Plaintiff alleges three ways in which the Union breached its duty: (A) it failed to pursue his discharge claim; (B) it failed to adequately represent him in his grievance for back wages; and (C) it failed to advise him of his contract rights and provide him with a copy of the CBA. Each ground is addressed separately.

## A. Retaliatory Discharge

The Union argues that its determination not to pursue plaintiff's retaliatory discharge grievance did not violate its duty because the grievance was not meritorious. In support of this argument the Union points to three facts: (1) that during the conversation in which plaintiff was fired, he admits to telling the Senecas that he refused to work with a painter that the Company had rehired; (2) that at that time, plaintiff was aware that he could be discharged for insubordination; and (3) that, if the Union pursued the grievance, it would be in the untenable position of having Mr. Wallace testify against plaintiff as to what happened that day. These arguments both misunderstand plaintiff's allegations as to what happened on June 5, 2000 and ignore the standard on summary judgment.

The Union is correct that it is not obligated to pursue every grievance. See Bynog v. SL Green Realty Corp., No. 05 Civ. 0305, 2007 WL 831740, *10 (S.D.N.Y. March 20, 2007) ("The 'duty of fair representation is not a straightjacket which forces Unions to pursue grievance remedies ... in every case where an employee has a complaint against the company.'") (quoting Carrion v. Local 32B-32J Serv. Employees Int'l Union, AFL-CIO, No. 03 Civ. 1896, 2005 WL 659321, at *5-6 (S.D.N.Y. Mar. 21 2005)). It is also correct that where the Union investigates a member's claim and reasonably determines that it is either meritless or simply unwinnable, it has satisfied its duty. See Jordan v. Viacom Outdoor Group, 475 F. Supp. 2d 440, 444 (S.D.N.Y. 2007) ("'a Union must be free to sift out wholly frivolous grievances which would only clog the

grievance process....'") (citing Humphrey v. Moore, 375 U.S. 335, 349, 84 S.Ct. 363 (1964)) and Bynog, 2007 WL 831740, at *11 (finding that there was no breach of duty where Union declined to arbitrate grievance because it determined it would not prevail on the merits). This, however, is not the case here.

Although plaintiff may have also been insubordinate during one portion of the June 5, 2000 conversation, he alleges that he was not discharged until Mr. Wallace announced that he was the new shop steward. This formulation of the events is supported, at least in part, by Carlo Seneca's recollection of the conversation as centering on plaintiff being the new shop steward. According to plaintiff, it was the Union's desire to use him as a pawn in its ongoing disagreements with the employer that caused his discharge. If that is true, a grievance alleging retaliatory discharge may have been meritorious.

Whether or not plaintiff's account is true, for purposes of this motion, the Court is obligated to assume that it is. Cumberbatch v. Port Authority of New York and New Jersey, No. 03 Civ. 749, 2006 U.S. Dist. LEXIS 88853, *7 (S.D.N.Y. Dec. 7, 2006). This means that although Mr. Wallace protests, the Court must assume that he did in fact make the statements alleged by plaintiff.[4]

Even assuming plaintiff's version of events, the Union might still have satisfied its duty if it had asked an independent Union official to investigate the incident and that official had determined that because it was plaintiff's word against the word of three others, the grievance was not likely to succeed and not worth pursuing. See e.g. Bynog, 2007 WL 831740, at *11. But because it was Mr. Wallace himself who determined not to pursue the grievance despite

---

[4] As unlikely as the Union asserts this fact to be, it is not implausible and is supported by documentary evidence that the Union listed plaintiff as a shop steward on various jobs shortly after his termination from defendant Company. The only contradictory evidence provided by the Union is the statement of Mr. Wallace, which the Court may not take over plaintiff's at this stage.

knowing what actually happened – which I must presume to be as plaintiff describes it - I cannot

reach the same conclusion. Therefore, what really happened on June 5, 2000 and whether Mr.

Wallace's decision not to grieve plaintiff's termination was in bad faith are questions of fact.

### B. Back Pay Grievance

Of plaintiff's many grievances, this is the only one that the Union, at least in part,

decided to pursue. Plaintiff wanted the Union to pursue unpaid Union wages for his entire

employment with the Company. The Union only pursued 56 hours of work performed during

May and June of 2000. The undisputed facts are that the Union filed a grievance, arranged and

attended a grievance hearing, attempted to negotiate a settlement with the Company, demanded

an arbitration, attended the arbitration and facilitated a Consent Award of wages and benefits in

the amount of $3,025.68, which plaintiff accepted. Moreover, although the process did not

proceed as smoothly or as quickly as plaintiff would have liked, the Union also assisted plaintiff

in obtaining compliance with the consent award.

Plaintiff's problems with that portion of his claims that the Union did pursue are

generally that the representation was not aggressive enough, not fast enough, and that he was not

kept sufficiently informed along the way. None of these complaints rise to a breach of the duty

of fair representation. See Bellesfield v. RCA Comm., Inc., 675 F. Supp. 952, 957-58 (D.N.J.

1987) (rejecting plaintiffs claims that a delay in the commencement of the grievance and the

Union's failure to inform the plaintiff of other procedural options or the status of his grievance

were indicative of bad faith and a breach of the duty of fair representation). See also, Diem, 234

F.3d 1261 at 2 (agreeing with district court's determination that where the Union represented

plaintiff at each progressive stage of the grievance-arbitration procedure, it did not breach its

duty). Plaintiff is unable to muster any evidence of bad faith with regard to the Union's

prosecution of this grievance. What becomes clear from the record is that plaintiff's dissatisfaction with the Union's decision not to pursue the remainder of his claims caused friction between plaintiff and the Union in the course of the grievance that was pursued.

In determining which claims the Union would pursue and thereby, which claims for back pay it would not pursue, Mr. Wallace investigated plaintiff's claim as discussed above. The information he received indicated that plaintiff was not on the site for that much time and that, of the time he was there, most of the work he performed was not covered by the CBA. There may have been evening and weekend time, as plaintiff alleges, but because no stewards are around at those times it would have been hard to prove. Finally, when plaintiff had the opportunity to and was asked to submit his documentation in support of his claims, he refused, preferring to wait until he could retain private counsel.

Plaintiff presents no evidence contradicting Wallace's testimony of his investigation. Instead, plaintiff questions the veracity of Wallace's account on the basis that no written records of the investigation have been produced. The absence of documentary records could raise an issue of fact as to the conduct of the investigation if plaintiff had presented any evidence that the creation of such documents was standard practice. He has not. Plaintiff simply refuses to take Wallace's word for his own actions without having any personal knowledge that is to the contrary. This is not sufficient. Simply calling someone a liar does not raise an issue of fact for purposes of summary judgment. Fernandez v. China Ocean Shipping, (Group) Co., 312 F.Supp.2d 369, 378 (E.D.N.Y. 2003), aff'd, 94 Fed. Appx. 866, 867 (2d Cir. 2004) (citing Brown v. Johnson & Johnson Consumer Prods., 1994 WL 361444, at *4 n. 3 (S.D.N.Y. July 11, 1994)).

Based on Wallace's investigation and the facts as they were known to the Union at the time, no reasonable jury could find that the Union acted either arbitrarily or in bad faith when it

23

determined not to pursue back wages for the remainder of plaintiff's work on the Holy Rosary project. As noted above, a Union is not required to pursue every grievance, Bynog, 2007 WL 831740, at *10, nor is it required to pursue grievances that it deems, after investigation, to be meritless or unwinnable. Jordan, 475 F. Supp. 2d at 444. Additionally, a plaintiff's refusal to cooperate in the investigation, as plaintiff did during the grievance process, bolsters the Union's decision to seek limited recovery. See Bynog, 2007 WL 831740, at *11. Therefore, although the Union could have done more in its investigation, its conduct does not reasonably support an inference of arbitrariness or bad faith. See Woods v. Dunlop Tire Corp., No. 85 Civ. 1464, 1988 WL 66173, *4 (W.D.N.Y. June 23, 1988). See also Evangelista v. Inland boatmen's Union of Pacific, 777 F.2d 1390, 1395 (9th Cir. 1985) ("A Union's duty of fair representation includes the duty to perform some minimal investigation, the thoroughness of which varies with the circumstances of the particular case.).

To the extent that plaintiff is also alleging that the Union breached its duty by not pursuing his current claims for payment of a Union wage on other projects which he now contends are also covered by the CBA, those claims were never urged upon the Union such that it had an opportunity to either satisfy or breach its duty with regard to investigating and pursuing grievances. Any such claims are better dealt with in plaintiff's third ground for a breach of the duty of fair representation.

## C. Failure to Inform About Union Representation and Provide a Copy of the CBA

Plaintiff alleges that the Union breached its duty to fairly represent those covered by the CBA by failing to timely notify employees working on Union projects of their Union rights. He also claims that the Union violated its duty by failing to provide him with a copy of the CBA.

The Union argues that these claims lack merits for several reasons: (1) plaintiff has failed to prove that the CBA reached beyond the Holy Rosary project; (2) even if the CBA applied, he has also failed to show that he performed covered work on other projects; (3) as a foreman he would have been excluded from the coverage of the CBA; (4) such claims are time barred; and (5) he is actually trying to impermissibly state a claim under the Labor Management Reporting and Disclosure Act (the "LMRDA") for the first time on this motion.

Taking plaintiff's claim that the Union breached its duty by not voluntarily providing him with a copy of the CBA first, defendant fails to point to any authority that plaintiff's claim must be brought under the LMRDA and cannot also be a duty of fair representation claim. See Simo v. Union of Needletrades, Indus. & Textile Employees, Southwest Dist. Council, 322 F.3d 602, 615-16 (9th Cir. 2003) (discussing overlapping duty of fair representation and LMRDA claims for failure to provide a copy of a CBA). Although plaintiff does point to the LMRDA in his opposition, he also discusses the Union's duty of fair representation in this regard.

However, plaintiff's claim still fails. The LMRDA specifically provides that an employee has a right to obtain a copy of the CBA *upon request*. 29 U.S.C. § 414. The Union is not required to volunteer a copy as a matter of course. It is undisputed that plaintiff made no request for a copy of the CBA prior to discovery in this case and, although it took some time and the assistance of the Magistrate Judge, plaintiff was ultimately provided with a copy of the agreement. Therefore, the Union is in compliance with the LMRDA. Where Congress has set out a Union's minimum responsibility and defendant has satisfied it, I cannot find that it has breached its duty of fair representation.

Turning to plaintiff's second claim, that the Union had an obligation to inform the Company's employees that they were represented by a Union and working in a Union shop, I find that plaintiff has raised an issue of fact that prevents resolution on summary judgment.

First, it is undisputed that with regard to the Holy Rosary project, plaintiff was advised that it was a Union job almost immediately. Therefore, there can be no claim for breach of the Union's duty or a violation of the LMRDA with regard to Holy Rosary. It is also undisputed that the Union took no action with regard to any of the other projects plaintiff worked on. What is in dispute is whether those jobs were actually covered by the CBA.

The Union has neither pointed to language in the CBA that limits it to the Holy Rosary project nor explained the genesis of such limitation. Therefore, I cannot agree with the Union that plaintiff has failed to raise an issue with regard to the applicability of the CBA. See Sim v. New York Mailers' Union Number 6, 166 F.3d 465, 470 (2d Cir. 1999) (a court will "ignore interpretations made by Union officials which run adverse to the plain meaning of contract language").

Defendant's arguments that plaintiff's status as a foreman or performance of work other than carpentry undermines his claim also fail. Although plaintiff avers that he performed some foreman duties, it was not all of the time. Similarly, plaintiff avers that he performed carpentry work at Holy Rosary and other locations. As the Union had no presence on the other projects, there is no evidence in the record to contradict plaintiff's assertions.

The Union's argument that this claim is time barred is also unpersuasive. The relevant limitations period is six months, see DelCostello v. Int'l Broth. of Teamsters, 462 U.S. 151, 169, 103 S.Ct. 2281 (1983), and "'begins to run when the employee knew or should have known of the breach of the duty of fair representation.'" Campbell v. Kane, Kessler, P.C., 144 Fed. Appx.

127, 131 (2d Cir. 2005) (quoting White v. White Rose Food, 128 F.3d 110, 114 (2d Cir.1997)). See also Cruz v. Midwood Ambulance & Oxygen Service, Inc., 136 Fed. Appx. 414, 415 (2d Cir. 2005). Plaintiff was discharged on June 5, 2000 and commenced suit against the Union in October, 2000, well within the limitations period. Plaintiff did not receive a copy of the CBA until after the commencement of this action and therefore could not have known that the Union may have breached its duty with regard to other projects until then.

Finally, the Union's argument that plaintiff relies solely on the LMRDA for this claim is simply inaccurate. Although I agree that plaintiff should not be permitted to raise an LMRDA claim for the first time on this motion, plaintiff's opposition also explicitly relies on cases grounded in the Union's duty of fair representation. For example, plaintiff relies on United Paperworkers Int'l. Union, AFL-CIO, CLC, 320 NLRB 349, 349 (Dec. 20, 1995), rev'd on other grounds sub nom., Buzenius v. N.L.R.B., 124 F.3d 788, 790 (6th Cir. 1997), where the NLRB determined that a Union had breached its duty of fair representation by failing to inform employees of their rights with regard to dues payment and Union membership.

The duty of fair representation is a "broad concept" that extends to the negotiation, administration and enforcement of a CBA. U.S. v. District Council of New York City, 941 F. Supp. 349, 371-72 (S.D.N.Y. 1996). This duty is broad enough to encompass a Union's failure to inform employees of relevant rights and information. See N.L.R.B. v. Local 282, Int'l Broth. of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 740 F.2d 141, 146 (2d Cir. 1984) (holding that there is "no reason why a breach of this duty cannot also be found...[where] the Union is charged with failing to inform many of its members about an arbitration award affecting their employment status). See also Byrne v. Buffalo Creek R.R. Co., 536 F. Supp. 1301, 1311 (W.D.N.Y. 1982) (Union breached duty where it did not inform employee of written

authorization prerequisite to commencing a grievance and failed to commence a grievance on that basis); Retana v. Apartment, Motel, Hotel and Elevator Operators Union, Local No. 14, AFL-CIO, 453 F.2d 1018, 1027 (9th Cir. 1972) (a Union's failure to advise an employee of her contract rights may constituted a breach of the duty of fair representation).

Should plaintiff prevail in proving that the CBA applied to other projects and that he performed covered work on those projects, a reasonable jury could find that the Union acted arbitrarily or in bad faith by failing to so much as notify the employees that there was a CBA and a Union in place.

## IV. Negligence Claim

Pursuant to Judge Johnson's March 16, 2005 Order, this claim has been struck from the amended consolidated complaint. Even if the claim had survived to this stage, it would be dismissed on the same grounds articulated in Magistrate Judge Pollack's Report and Recommendation.

## V. Summary Judgment as to Claims Against The Company

The Seneca Defendants' last argument, a mere half a page long, is for summary judgment as to all claims alleged against them. They cite entirely to state law and provide nothing more than vague statements of the standard on summary judgment. The argument utterly fails to state a single factual ground which would entitle them to judgment as a matter of law. Instead, it charges this Court with hornbook non-sequiturs such as "issue finding rather than issue determination." (Seneca Defendants' Brief at 21). Therefore, except as to those claims that cannot survive as a matter of law because the Court is dismissing plaintiff's companion duty of fair representation claims, the Seneca Defendants' motion for summary judgment is denied.

## CONCLUSION

For the reasons stated above, the Union's [204] motion for summary judgment is DENIED in part and GRANTED in part. Likewise, the Seneca Defendants' [102] motion for summary judgment is DENIED in part and GRANTED in part. The following claims survive for trial:

1. Unpaid overtime pursuant to the FLSA;
2. Unpaid overtime, supplemental wage and/or "call-in pay and laundry/uniform allowance pursuant to NYSLL;
3. Breach of implied contract to pay prevailing wage for work performed on public works projects;
4. Third party beneficiary to contracts for payment of prevailing wage;
5. Retaliatory discharge in violation of the FLSA;
6. Retaliatory discharge in violation of NYSLL;
7. Discharge without cause in violation of the CBA;
8. Breach of duty of fair representation for failure to grieve termination and for failure to advise of contract rights on projects other than Holy Rosary.

The cases are referred to Magistrate Judge Pollak to conduct the final pretrial conference and certify that the cases are trial-ready.

**The Clerk of the Court is directed to mail a copy of this Order to plaintiff *pro se*.**

**SO ORDERED.**

/Signed by Judge Brian M. Cogan/

U.S.D.J.

Dated: Brooklyn, New York
September 5, 2007

29