UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
THOMAS MAZZA, JR.,

                Plaintiff,

        - against -

DISTRICT COUNCIL FOR NEW YORK AND
VICINITY UNITED BROTHERHOOD OF
CARPENTERS AND JOINERS OF AMERICA,

                Defendant.
-----------------------------------------------------------X
THOMAS MAZZA, JR.,

                Plaintiff,

        - against -

ANTHONY SENECA, CARLO SENECA,
conducting business under the name of
C & A SENECA CONSTRUCTION,

                Defendants.
-----------------------------------------------------------X

**MEMORANDUM
AND    ORDER**

00 CV 6854 (CLP)

01 CV 6002 (CLP)

BACKGROUND

I.    Factual and Procedural Overview

      In approximately October 2000, plaintiff Thomas Mazza, Jr., proceeding pro se, filed

three actions in Civil Court, Richmond County, against District Council of New York and

Vicinity, United Brotherhood of Carpenters and Joiners of America, AFL-CIO (the "Union"),

seeking damages for loss of the use of his property, loss of time from work, and breach of

contract.  The Union removed the actions to federal court on or about November 16, 2000.

      On September 5, 2001, plaintiff filed a separate pro se action in this Court against

Anthony Seneca and Carlo Seneca (the "Seneca defendants"), conducting business under the name of C & A Seneca Construction (the "Company"), claiming various violations of the Fair Labor Standards Act ("FLSA"), the New York Labor Law ("NYLL"), and the Collective Bargaining Agreement ("CBA") in effect between the Union and the Seneca defendants. On February 23, 2004, the two actions were consolidated, and on September 5, 2007, the Honorable Brian Cogan issued a ruling on the parties' cross-motions for summary judgment, detailing the claims that remained for trial.

Following completion of discovery, the parties consented to trial before the undersigned, which began on September 15, 2008. The jury returned a verdict on September 26, 2008, finding that plaintiff had proven all elements of his overtime claim under the FLSA and awarding him $5,000.00. The jury also found that plaintiff had proven all elements of his overtime claim under the NYLL and awarded him $7,000.00. The jury found that plaintiff had failed to carry his burden on his claims for prevailing wages under the NYLL, retaliation under either the FLSA or the NYLL, or his claims against either the Seneca defendants or the Union defendant for alleged breaches of the CBA.

By Notice of Motion dated October 6, 2008, plaintiff moves to set aside the verdict and for a new trial pursuant to Rules 59(a) and 59(e) of the Federal Rules of Civil Procedure. Also by Notice of Motion dated October 6, 2008, the Seneca defendants move pursuant to Rule 50 of the Federal Rules of Civil Procedure for judgment as a matter of law. Alternatively, the Seneca defendants move to reduce the damages award, arguing that the verdict rendered represents duplicative damages for the same economic injury.

For the reasons set forth below, plaintiff's motion pursuant to Rule 59 is denied. The

Seneca defendants' motion pursuant to Rule 50 is denied, except the Court grants the Seneca defendants' motion to reduce the damages award as detailed below.

II.    Evidence Presented at Trial

The parties stipulated that Anthony Seneca and Carlo Seneca, conducting business under the name C & A Seneca Construction, are engaged in the construction and renovation of buildings in the five boroughs of New York City. (Stip.[1] ¶ 1). Both Anthony and Carlo Seneca are partners, principals, and agents of the Company. (Id. ¶¶ 2-3) Evidence introduced at trial established that sometime in 1997, plaintiff Thomas Mazza was hired by Carlo Seneca and his father, Anthony Seneca, to do painting work for the Company. (Tr.[2] at 542-44). According to the testimony of Anthony Seneca, plaintiff was hired at the request of plaintiff's brother, James Mazza, who was a Company employee. (Id. at 542-43). Between 1998 and 2000, plaintiff worked on a number of Company projects throughout New York City. (Id. at 405-08, 1013, 1018; Pl.'s Exs.[3] 2, 3, 4). During this time, plaintiff performed work as a painter and laborer, as well as a variety of other tasks. (Tr. at 259, 272, 344, 413).

From 1998 to 2000, plaintiff worked for the Company on construction jobs at several publicly subsidized day care centers, including a facility on Soundview Avenue in the Bronx called Seven Corners Day Care Center ("Seven Corners"), a facility on Linden Boulevard in

[1]Citations to "Stip." refer to the parties' Stipulations of Fact in their Joint Pretrial Order, filed on July 1, 2008.

[2]Citations to "Tr." refer to the transcript of the trial held before this Court from September 15, 2008 to September 26, 2008.

[3]Citations to "Pl.'s Ex." and "Defs.' Ex." refer to the exhibits admitted into evidence at trial by plaintiff and defendants respectively.

Queens called NAACP Jamaica Day Care Center ("NAACP"), a facility on Koscuiszko Street in

Brooklyn called Tabernacle Church of God Day Care Center ("Tabernacle"), and a facility on

Jerome Avenue in Staten Island called Holy Rosary ("Holy Rosary"). (Id. at 405-08; Pl.'s Exs.

2, 3, 4). The work performed by the Company at each day care construction project was divided

into two categories: 1) "tenant" work, which was subsidized by the Administration for

Children's Services, an agency of the City of New York; and 2) "landlord" work, which was not

subsidized by any City agency, but paid for exclusively by the landlord or owner of the building.

(Tr. at 45, 134-35, 355, 410-11, 550-54, 1162; Pl.'s Exs. 2, 3, 4).

At trial, Carlo Seneca testified that the "tenant" work was performed by skilled laborers

such as carpenters, while the "landlord" work was performed by less skilled laborers and

painters, like plaintiff. (Tr. at 413). Since all "tenant" work was subsidized by a government

agency, New York law required the Company to pay prevailing wages to all workers performing

such work. (Id. at 452). The Company, however, was not required to pay prevailing wages to

workers assigned to perform "landlord" work on the day care projects. (Id.) In addition to the

day care center jobs, plaintiff also worked on a Company project to build a private home for Dr.

Pritpal Kang in Todt Hill on Staten Island ("Kang home"). (Id. at 25, 166-67, 288).

Plaintiff testified that he worked on these projects during both the day and the evening.

(Id. at 1031-35). According to plaintiff, he put "a lot of hours in" and often "worked double

shifts." (Id. at 1067). In fact, plaintiff testified that he worked seven days a week "a majority of

the time." (Id.) He recalls his wage rate being $54 per hour, inclusive of benefits. (Id. at 1070).

According to Carlo Seneca, the Seven Corners construction project, which he described

as not a "large project" for the Company, and took "three to four months" to complete, cost

between $400,000 and $600,000 to complete. (Id. at 413, 418). Additionally, the contract documents for the construction of the Tabernacle project indicates a total cost of roughly $800,000. (Pl.'s Ex. 3). Carlo Seneca further testified that, in recent years, the Company has been consistently engaged in construction projects, having completed "probably 60 jobs" in the past decade. (Tr. at 417).

On August 12, 1999, the Company became a party to a CBA with the Union. (Id. at 101-03; Pl.'s Ex. 21[4] at 1). The parties stipulated that the Union is a labor organization, which represents carpenters and other workers throughout the New York metropolitan area. (Stip. ¶ 4). The parties further stipulated that the Seneca defendants performed construction work on at least one project that was covered by the CBA with the Union – namely, the Holy Rosary project. (Id.) Although the CBA contained a clause stating that all wage and benefit obligations were to apply retroactively to July 1, 1996, Denis Shiel, Vice President of the Union, testified that the CBA's obligations were not applicable to any work performed by the Company prior to August 12, 1999. (Tr. at 140-42; Pl.'s Ex. 21 at 49). According to Shiel, the CBA was in force from August 12, 1999 until June 30, 2001, when it expired without being renewed. (Tr. at 150; Pl.'s Ex. 102).

According to Carlo Seneca, the Company signed the CBA with the understanding that it would apply only to the Holy Rosary project. (Tr. at 431-33, 436). However, Seneca also testified that he had not fully read the CBA before signing it, and relied instead on a handshake and a verbal agreement with the Union. (Id. at 427, 431-36). Denis Shiel testified that the

---

[4]The CBA between the Company and the Union, signed on August 12, 1999, was entered into evidence at trial as Plaintiff's Exhibit 21.

obligations of the CBA extended beyond the Holy Rosary project and required the Company to pay union wages to all carpenters it employed on any joint venture within the Union's geographic jurisdiction, an area that included all of the Company's day care projects. (Id. at 110, 117, 820). Moreover, the text of the CBA does not limit the agreement to any one site. (See Pl.'s Ex. 21).

Evidence presented at trial indicated that tasks considered "carpentry work" under the CBA included, inter alia, installing tile, installing wall moulding, framing walls and "sheetrocking," or dry wall. (Tr. at 1016; Pl.'s Ex. 21 at 2-6). Painting, cleaning, and unskilled labor work, however, were not considered carpentry tasks. (Tr. at 418). At trial, a number of witnesses testified that plaintiff worked largely as a painter and unskilled laborer during his time with the Company. (Id. at 49, 166-67, 259, 413). Anthony Seneca, for instance, testified that plaintiff was hired as an unskilled laborer, which he described as "painter and handyman, an all-around guy," and someone who "carries a refrigerator upstairs." (Id. at 575-76). When asked if a handyman can "do carpentry work," Seneca responded that a handyman "can drive a nail, turn a screw, change a light bulb." (Id. at 576). According to plaintiff's testimony, however, he did in fact work for the Company as a carpenter, performing tasks that included tile work and sheetrocking. (Id. at 1015-20, 1287-88, 1291). Plaintiff further testified that on June 5, 2000, he received a membership card from the Union indicating that he was a carpenter. (Id. at 146-47, 1034-35; Pl.'s Ex. 57).

Stephanie Mazza, plaintiff's wife, testified that she saw plaintiff engaged in the installation of sheetrock and tile while he was employed at the Holy Rosary site, and that she observed him doing only limited painting. (Tr. at 30). She also observed him acting like "kind

of a foreman." (Id. at 26). Ms. Mazza's testimony was supported by shop steward reports from the Holy Rosary site, which were signed by shop steward, Joseph Gershom, and which indicated that plaintiff performed 24 hours of carpentry work. (Pl.'s Ex. 34). Thomas Paladino, another former Company employee, testified that while at the Kang home site, he also observed plaintiff sheetrocking, hanging doors, and working on wall moulding. (Tr. at 258-59). Mr. Paladino recalled that plaintiff was "running the job." (Id.) Additionally, Zadie Davis, director of the Tabernacle Day Care Center, testified that she saw plaintiff performing tile work in addition to painting while at Tabernacle. (Id. at 49). Finally, Vincent Impeduglia, another Company employee, testified that while working at the Seven Corners project, plaintiff performed carpentry tasks, including "putting tile on the floor," in addition to painting. (Id. at 272-73, 284). He testified that Frank Hayes was the foreman on the job, but that "[w]hen Mr. Mazza used to come to paint, I had to listen to him." (Id. at 314).

Anthony Seneca admitted that since he was not present at every job performed by plaintiff, he could not be certain that plaintiff had not performed any carpentry work. (Id. at 577). However, according to Carlo Seneca, even if plaintiff had been "doing carpentry" tasks or was "trying to learn carpentry," he was still not considered to be a "carpenter" for employment purposes. (Id. at 577-78). Seneca further testified that the Company never hired plaintiff as a carpenter; plaintiff was hired only as a painter and laborer, and if he performed carpentry work, it was limited to incidental tasks at the Holy Rosary site and was not done at the request of the Senecas. (Id. at 505, 577-78). However, plaintiff stated that he was "hired as a foreman and a carpenter" on the Kosciusko day care center job. (Id. at 1023). Plaintiff also submitted into evidence a check paid by the Company on behalf of plaintiff to New York City District Council

of Carpenters Vacation Fund in the amount of $287.40 for 81 hours worked during a six month period ending December 31, 2000.  (Pl.'s Ex. 78).

Christopher Wallace, who the parties stipulated was a Union representative, was the individual who informed plaintiff that he was required to become a Union member if he continued to perform bargaining unit work.  (Stip. ¶ 5).  Wallace testified at trial that there is a distinction between simply performing carpentry tasks and being considered a carpenter for employment purposes.  (Tr. at 809-13).  According to Wallace, a worker would only be considered a carpenter for employment purposes if the worker appeared knowledgeable and experienced in carpentry.  (Id.)  Lionel O. Williams, who served as a Union shop steward on jobs at which plaintiff was employed by the Company, also testified that a worker would only be considered a carpenter if he had attained a specialized set of skills and had undergone either formal or informal training.  (Id. at 739-43).  Williams, for instance, started as an apprentice before he was considered a carpenter.  (Id. at 729).

Joseph Gershom, who served as the Union shop steward at Holy Rosary, testified that whenever plaintiff tried to do sheetrocking, Gershom attempted to stop him.  (Id. at 1076).  Gershom also testified that plaintiff threatened him at times (id.), and would attempt to "sneak back inside" the Holy Rosary project to do carpentry work at night when plaintiff thought he was not going to be observed.  (Id. at 1079).  Mr. Gershom claims to have observed plaintiff attempting to do this while driving his car around the site at night.  (Id.)  Additionally, Gershom testified that he only recorded that plaintiff performed carpentry work on the shop steward report because he saw plaintiff doing some carpentry tasks, among many other "different things."  (Id. at 1093-94; Pl.'s Ex. 34).

Christopher Wallace testified that, based on his interviews with Company workers during his investigation of the Holy Rosary site, plaintiff had rarely engaged in carpentry work. (Tr. at 878, 899). Additionally, Zadie Davis testified that she had seen plaintiff working on stilts at the Tabernacle (id. at 48); according to Christopher Wallace, only workers considered to be painters or plasterers would own such stilts. (Id. at 901). Plaintiff testified that workers designated as Union carpenters would not have performed any non-carpentry tasks on a job site. (Id. at 1291). In response to being shown a picture of himself with tree stumps and other objects, plaintiff testified that he did not remove or chop up tree stumps, but he admitted that in addition to carpentry tasks, he did everything – "[w]hatever it took to get the job done for the Company." (Id. at 1290-91).

At trial, it was established that prior to June 5, 2000, the Senecas loaned plaintiff money upon request, allowed him to use Company equipment on his own personal sidejobs, and arranged for him to rent an apartment at a below market rate with rent payable to Anthony Seneca. (Id. at 473-74, 1037, 1046, 1283). Additionally, according to the testimony of Anthony Seneca, although plaintiff often fought with the Senecas and had been sent off the job for using drugs and alcohol on the job and for poor quality work, the Company never fired him. (Id. at 565-76).

Plaintiff testified that in the weeks leading up to June 5, 2000, he had been told by a number of people, including Joseph Gershom and Christopher Wallace, that if he wanted to continue to perform carpentry tasks at Holy Rosary, he would need to obtain a membership card from the Union. (Id. at 1033-34; see also Stip. ¶¶ 8-9). Plaintiff continued to perform work after he was told of the Union card requirement. (Stip. ¶¶ 9-11). On the morning of June 5, 2000,

plaintiff went to the offices of Christopher Wallace to obtain a membership card.  (Tr. at 32-33, 749-53).  Wallace testified that he followed plaintiff to the Holy Rosary site in order to investigate the non-union work that plaintiff claimed was being performed.  (Id. at 746-54).

Upon receiving his Union card, plaintiff returned to work (Stip. ¶ 11), and plaintiff's wife drove him to the Holy Rosary site, where he met the Senecas.  (Tr. at 35).  According to plaintiff, when he arrived on the site with Mr. Wallace, the Senecas told him that they had re-hired a painter who plaintiff had previously fired.  (Id. at 1037; see also Stip. ¶ 12).  Plaintiff testified that he then told the Senecas that he refused to work as long as the painter was on the site, even though he knew such behavior represented "insubordination."  (Tr. at 1135; see also Stip. ¶ 14).

According to Carlo Seneca, as soon as plaintiff arrived at Holy Rosary on June 5, 2000, plaintiff attempted to fire two Company employees – Union shop steward Joseph Gershom and a painter – before announcing that he was the new shop steward on the job.  (Id. at 475-77).  Joseph Gershom confirmed this statement, testifying that when plaintiff arrived at Holy Rosary, plaintiff attempted to fire him.  (Id. at 1080).  According to Carlo Seneca, the subsequent verbal altercation between the Senecas and plaintiff focused on plaintiff's inappropriate behavior, specifically the fact that he had "come on a job site firing everybody" when he had "no authority" to do so.  (Id. at 476).  Seneca testified that after this confrontation in which plaintiff "went nuts," plaintiff stormed off the work site and refused to come back, effectively choosing to end his employment with the Company; according to Seneca, plaintiff "fired [him]self."  (Id. at 475).

Anthony Seneca testified that he felt that plaintiff had acted in a "devious" fashion in getting his Union card and that acquiring this card was part of plaintiff's "scam . . . to get into

the Union to start trouble." (Id. at 688). Carlo Seneca, however, testified that whether or not an employee chooses to join a union did not concern the Company, and that plaintiff's Union membership was not related to his termination. (Id. at 1379-80). Additionally, Christopher Wallace testified that, prior to June 5, 2000, four or five other Company workers at the Holy Rosary job had received Union cards. (Id. at 764). Wallace also testified that he "didn't believe" that the Senecas had any problems with employees receiving Union cards. (Id. at 765-66). According to plaintiff, however, the Senecas were angry because he produced his new Union membership card (id. at 1132), at which point both Senecas yelled at him and told him to leave the work site. (Id. at 1137). Plaintiff recalls that "Carlo threatened to have me killed." (Id. at 1041). Plaintiff testified that he felt he had been terminated after this interaction. (Id. at 1135).

While plaintiff was employed by the Company, he rented an apartment from the Senecas, paying rent to Anthony Seneca. (Id. at 1046, 1396). Both plaintiff and Stephanie Mazza testified that on June 15, 2000, Joseph Mazza, plaintiff's brother and a past employee of the Company, violently broke into plaintiff's apartment while plaintiff's wife and her daughter were present, and committed an assault upon plaintiff. (Id. at 65-70, 1043-45). During the incident, the apartment sustained considerable damage, including the destruction of its door. (Id. at 70; Pl.'s Exs. 41, 52). Naceur Zayer, who owned a deli down the street, testified that he witnessed the attack and called the police. (Tr. at 588). Subsequently, plaintiff and his wife filed a police complaint against Joseph Mazza. (Pl.'s Ex. 44).

Plaintiff testified that the attack on his apartment was an act of retaliation for plaintiff having joined the Union and that the Seneca defendants instigated the attack. (Tr. at 1043).

Indeed, during the attack, according to plaintiff, Anthony and Carlo Seneca watched from outside the house without making any effort to stop Joseph Mazza. (Id.) Carlo Seneca, however, denied that the Senecas instigated the attack and that they stood by, testifying instead that once he became aware of the attack, he sent in his employees to stop it. (Id. at 481-82). He further testified that he believed the fight between the two brothers stemmed from an ongoing dispute over an antique table that was wholly unrelated to the events of June 5, 2000. (Id. at 488, 602). In addition to not being involved in the incident, Anthony Seneca testified that he and his son did not call the police only because they felt the fight was "petty" and "the cops were there already. They came within a few minutes." (Id. at 605).

Following the events of June 5, 2000, however, the Senecas sought to evict plaintiff from the apartment, commencing suit against plaintiff in landlord-tenant court in August 2000, claiming that he had failed to pay rent for several months. (Id. at 1046-47). In an effort to resolve the landlord-tenant action, Anthony Seneca offered to forgive seven months worth of unpaid rent if plaintiff would agree to vacate the apartment, but plaintiff refused this offer because he believed that the Senecas owed him unpaid wages. (Id.) On August 9, 2000, Judge Cyril K. Bedford of the Richmond County Civil Court ruled that plaintiff had failed to pay rent to the Senecas. (Pl.'s Ex. 52). Judge Bedford also awarded plaintiff an abatement of rent of $237.50 based on the damage to the apartment caused by Joseph Mazza that the Senecas had not repaired. (Id.) Plaintiff and his wife eventually moved out of the apartment. (Tr. at 1047).

Christopher Wallace testified that following plaintiff's June 5, 2000 departure from the Holy Rosary site, he spoke with the Senecas in an attempt to get plaintiff his job back, but the Senecas refused. (Id. at 766-67). In his role as Union representative, Wallace spoke to shop

steward Joseph Greshom and others in investigating plaintiff's claims that he was ejected from or told to leave the Holy Rosary job site. (Id. at 772-77). Wallace testified that, based on plaintiff's insubordinate behavior that he had observed on June 5, 2000, he determined that plaintiff would be unable to get his job back even if the Union chose to pursue his claims at an arbitration. (Id. at 771-77). Wallace did, however, offer to help plaintiff find new carpentry work and also offered to "see what he could do" about back wages. (Id. at 1042, 1137; Stip. ¶ 16).

Based on his investigation, Wallace, on August 2, 2000, filed a formal grievance against the Senecas on plaintiff's behalf, seeking "pay and benefits for 56 hours." (Stip. ¶ 17; Defs.' Ex. C). By Notice dated August 17, 2000, the Union's Grievance Committee scheduled a hearing for September 7, 2000 to consider plaintiff's claims. (Defs.' Ex. D). The Notice contained a request that any documents supporting the claim be submitted in advance of the hearing. (Id.) The hearing was postponed to September 26, 2000; on that date, plaintiff, Mr. Wallace, and other Union agents were present, as were representatives of the Company. (Tr. at 1140). Plaintiff testified that when Christopher Wallace requested that plaintiff provide supporting documentation to assist in the representation of his case at arbitration, plaintiff refused to do so. (Id. at 1142; Stip. ¶ 18).

At the grievance hearing, the Company and the Union agreed to a settlement of plaintiff's claim; the only requirement was that plaintiff fill out an IRS W-4 form. (Tr. at 1383). Plaintiff refused. (Id. at 1383-84; Stip. ¶ 20). Therefore, because the grievance was not resolved at the hearing, the Union filed a demand for arbitration, which was then scheduled for December 4, 2000. (Defs.' Ex. F; Stip. ¶ 23).

Plaintiff testified that two Union officials were present during the December 5, 2000 arbitration, although plaintiff did not believe they were acting on his behalf. (Tr. at 1145; Stip. ¶ 24). After the hearing, the parties agreed on the hours plaintiff had worked and the amount he was owed. (Tr. at 1146). Plaintiff was then awarded wages and benefits totaling $3,025.68, which he subsequently received in the form of two checks. (Id. at 1325; Defs.' Exs. H, L). This award was based on 56 hours of pay and plaintiff agreed to execute a W-4 form. (Stip. ¶¶ 25-28).

In addition to the arbitration, plaintiff also filed a charge against the Company with the National Labor Relations Board ("NLRB"). (Tr. at 1167; Stip. ¶ 33). By letter dated September 28, 2000, the NLRB Regional Director dismissed plaintiff's charge on the grounds that plaintiff was employed as a supervisor within the meaning of the National Labor Relations Act and, therefore, was not entitled to the protections of the statute. (Pl.'s Ex. 93). Plaintiff's appeal to the Office of Appeals was denied by letter dated November 27, 2000. (Pl.'s Ex. 94).

On October 5, 2000, after the Union had commenced grievance proceedings against the Company on plaintiff's behalf, plaintiff filed a second charge with the NLRB, this time against the Union. (Tr. at 1146; Stip. ¶ 35). This charge alleged that the Union had failed to adequately represent plaintiff in connection with his June 5, 2000 discharge. (Tr. at 1146-47). By letter dated November 27, 2000, the NLRB Regional Director dismissed plaintiff's charge on the basis that there was no evidence that plaintiff performed enough covered work to be eligible for union wages; plaintiff had been fired for insubordination; and the Union represented and attempted to negotiate a general release with the Company in "good faith." (Id. at 558-59; Stip. ¶ 35).

At trial, plaintiff testified that the Company had failed to pay him certain overtime wages

that were due for work he had performed. (Tr. at 554). In support of his claim for overtime pay, plaintiff introduced the Company's payroll records as exhibits during the trial. (Pl.'s Ex. 16). He also introduced certain shop steward reports, along with records from two audits conducted by the accounting firm of Schultheis & Panettieri (the "Firm") on behalf of the Union's benefit funds. (Pl.'s Ex. 79, 80).

Steven Bowen, the payroll audit director for the Firm testified that he conducted an audit for the Union relating to the Company. (Tr. at 1177; Pl.'s Ex. 80). Mr. Bowen explained that the Firm does a lot of work for the Union to "ensure benefits are paid to the funds." (Tr. at 1183). Mr. Bowen testified that during this examination, he found plaintiff's name in the audit records for " a limited number of hours," which were for the benefit fund, not payroll purposes. (Id.) When asked if the Company had underpaid plaintiff, Mr. Bowen responded that he "didn't look at [the Company records] for that purpose." (Id. at 1196).

With regard to the audit report entered into evidence as Plaintiff's Exhibit No. 80, covering the period from July 1, 2000 to June 30, 2001, Mr. Bowen testified that he had only "limited knowledge" of its contents and that he also did "not personally know who has full knowledge of [the audit] right now." (Id. at 1190). Mr. Bowen similarly testified that he did not "know for a fact who has full knowledge" of the contents of the audit report entered into evidence as Plaintiff's Exhibit No. 79, covering the period from July 22, 1999 to June 30, 2000. (Id. at 1192). As a result, Mr. Bowen was not able to explain the audit reports in any detail, despite Mr. Bowen's admission that plaintiff had spoken to him before his testimony and had informed him that he would be asked questions about the audit reports. (See, e.g., id. at 1194-95).

Another employee of the Firm, Anthony Sgroi, testified at trial about the audit reports. Mr. Sgroi is a manager at the Firm, with responsibility for overseeing auditors and supervisors. (Id. at 1197). He testified that he briefly familiarized himself with the audit reports in preparation for his testimony at trial, although he could not recall what his role was with regard to these audits at the time they were performed. (Id.) Mr. Sgroi described how the Firm generally conducts audits, which includes a review of all relevant tax and payroll documentation and collective bargaining agreements. (Id. at 1198-99).

According to Mr. Sgroi, the Firm conducted audits of the Company's Benefit Funds to determine whether the Company owed any contributions; the Firm did not audit wages, although Mr. Sgroi conceded that benefits are related to hours worked. (Id. at 1202-03). In examining Plaintiff's Exhibit No. 79, Mr. Sgroi could not say who at the Firm conducted the actual audit on behalf of the Benefit Funds. (Id. at 1204-05). He went on to describe in detail how the Firm performs an audit, which includes requesting all documentation that pertains to the period covered by the collective bargaining agreement. (Id. at 1210-22).

The audit reports recorded that plaintiff worked 81 hours and 56 hours, respectively, during the audit periods. (See, e.g., id. at 1227-30). Mr. Sgroi testified, however, that based on the Company records, it was not possible to determine when those hours were worked, as the hours were calculated from tax records; indeed, it is possible that the 81 and 56 hours may be overlapping. (See, e.g., id. at 1232, 1244-46; see also Pl.'s Ex. 80-7). He noted that the Company records reveal that employees earned $22.97 per hour in benefits. (Tr. at 1228). Mr. Sgroi agreed that getting any more specific information about the hours would be "tough"

through the Company's records. (Id. at 1232).

The handwritten employee time sheets that the Senecas produced as payroll records during discovery, and that were shown to the jury, were largely illegible in many places and listed employees only by nicknames, such as "Red,"[5] "Father," and "Cousin Carlo," without providing other identification. (Id. at 564, 979; Pl.'s Ex. 16). When asked, Anthony Seneca testified that the time sheets tracking each employee's hours were often written on a "napkin" or "a piece of plywood." (Tr. at 564-65). He also could not explain the Company's bookkeeping procedures, indicating that these questions should be referred instead to his accountant, Anthony Bruno, who Seneca said started employment with the Company in 2001 or 2002. (Id. at 564-65).

Sara Sharp, an office manager for the Company since 1999, similarly testified about the Company's payroll records. Ms. Sharp testified that when she took over as office manager in 1999, documents were missing regarding "everything," including the payroll records, because "the previous girl that worked there" had "destroyed" the records. (Id. at 967). Indeed, the Company replaced its old computer with a new computer, although the witness did not know whether existing files were transferred to the new system. (Id. at 995). Ms. Sharp explained that she is responsible for distributing payroll, meaning that once "the boss" put hours on the time sheet, she would "add them up, and [] send them to the bank." (Id. at 967-68, 992-93). Ms. Sharp testified that workers often "got cash" in envelopes in lieu of formal paychecks, although she affirmed that she believed taxes were withheld. (Id. at 978, 992-93).

―――――――――――――

[5]According to the testimony, "Red" referred to plaintiff Thomas Mazza. (Tr. at 567). Anthony Seneca explained that plaintiff had this nickname because he "got the red hair, nice blue eyes, you know." (Id.)

Anthony Bruno, who worked as the Company's accountant from approximately 1999-2005, testified at trial that all files related to any Company project from 2000 or earlier had probably been thrown out and were no longer available. (Id. at 922-23). Bruno testified that due to significant construction at his offices in 2004, very few records of employment or overtime were available from any Company projects completed prior to 2004. (Id. at 945). Additionally, Bruno testified that during his time as the Company's accountant, he never received any independent contractor agreements of the sort that would document plaintiff's employment. (Id. at 926). When Carlo Seneca was asked about the Company's bookkeeping and accounting practices, he denied any knowledge and suggested that such information was handled by two individuals, one of whom he identified only as "Lori" and who is not longer with the Company. (Id. at 410).

According to plaintiff, during his first week as a Company employee in 1997, a dispute arose between the Senecas and their employees because the Senecas refused to pay wages. (Id. at 1011). Additionally, during Christopher Wallace's investigation, the Union conducted an audit into the Company's payment of wages and benefits which revealed that the Senecas owed their employees approximately $13,954.00 in unpaid fringe benefits. (Pl.'s Ex. 80-7). Mr. Sgroi similarly testified that the independent audit revealed deficiencies of over $100,000. (See, e.g., Tr. at 1243).

DISCUSSION

I.  The Seneca Defendants' Motion Under Rule 50

The Seneca defendants move for judgment as a matter of law pursuant to Rule 50 of the

Federal Rules of Civil Procedure, arguing that, under the evidence presented at trial, no

reasonable jury could have found that they violated the FLSA, or if they did, that any such

violations were willful.  (Defs.' Mot.[6] at 2).


A.  Legal Standards

1.  Judgment as a Matter of Law

Rule 50 of the Federal Rules of Civil Procedure permits a trial court to grant judgment as

a matter of law either before or after the civil jury has rendered its verdict.  Fed. R. Civ. P. 50.  In

determining whether it should grant such a motion, the trial court must view "'the evidence in

the light most favorable to the party against whom the motion was made,'" Black v. Finantra

Capital, Inc., 418 F.3d 203, 208-09 (2d Cir. 2005) (quoting Smith v. Lighting Bold Productions,

Inc., 861 F.2d 363, 367 (2d Cir. 1988)), and it must give the non-moving party the benefit of all

reasonable inferences that may be drawn in his or her favor from the evidence presented at trial.

See Black v. Finantra Capital, Inc., 418 F.3d at 208-09.

The trial court should enter judgment as a matter of law only if "the evidence is such that,

without weighing the credibility of the witnesses or otherwise considering the weight of the

evidence, there can be but one conclusion as to the verdict that reasonable [jurors] could have

reached."  Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005) (internal quotations

and citation omitted).  That is, judgment as a matter of law should be granted where there is

"'such a complete absence of evidence supporting the verdict that the jury's findings could only

---

[6]Citations to "Defs.' Mot." refer to the Seneca defendants' Motion for Judgment as a
Matter of Law, filed on October 6, 2008.

have been the result of sheer surmise and conjecture . . . .'"  Song v. Ives Labs., Inc., 957 F.2d

1041, 1046 (2d Cir. 1992) (quoting Mattivi v. S. African Marine Corp., 618 F.2d 163, 168 (2d

Cir. 1980)); see also Brady v. Wal-Mart Stores, Inc., 531 F.3d 127, 133 (2d Cir. 2008).


### 2.  Fair Labor Standards Act

The FLSA, codified at 29 U.S.C. § 201, et seq., provides that "[e]very employer shall pay

to each of his employees who in any workweek is engaged in commerce or in the production of

goods for commerce" a statutorily prescribed minimum wage.  29 U.S.C. § 206(a) (2006).  The

FLSA also provides that "no employer shall employ any of his [covered] employees . . . for a

workweek longer than forty hours unless such employee receives compensation for his

employment in excess of the hours above specified at a rate not less than one and one-half times

the regular rate at which he is employed."  29 U.S.C. § 207.

To make out a claim under the FLSA, a plaintiff must prove:  1) the defendant is an

"enterprise engaged in commerce or in the production of goods for commerce;" 2) the plaintiff is

an "employee" within the meaning of the FLSA; and 3) the employment relationship does not

fall within an exception to the FLSA.  See Edwards v. Cmty. Enters., Inc., 251 F. Supp. 2d 1089,

1098 (D. Conn. 2003) (citing Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 295

(1985)).  A defendant is an "enterprise engaged in commerce or in the production of goods for

commerce" if any of the following are satisfied:  1) defendant is an enterprise that "has

employees engaged in commerce or in the production of goods for commerce, or that has

employees handling, selling, or otherwise working on goods or materials that have been moved

in or produced for commerce by and person; and . . . whose annual gross volume of sales made

or business done is not less than $500,000;" 2) defendant is a healthcare organization; or 3) defendant is a public agency.  29 U.S.C. § 203(s).

The standard measure of damages for a FLSA violation is "unpaid minimum wages, or . . . unpaid overtime compensation, as the case may be, and an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).  The recovery of double damages, in the form of liquidated damages, however, is qualified by Section 260, which generally requires the plaintiff to prove willfulness on the part of the employer.  29 U.S.C. § 260.  The Section reads in relevant part: "[I]f the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [FLSA], the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title."  Id.

Nonetheless, although the plaintiff must ultimately prove that the defendant acted willfully to be awarded liquidated damages, the defendant is presumed to have done so.  Herman v. RSR Sec. Servs. Ltd., 172 F.3d 132, 141 (2d Cir. 1999).  This means that the employer has the burden of proving "good faith and reasonableness."  Id. at 142.  The Second Circuit has noted that "the burden is a difficult one, with double damages being the norm and single damages the exception."  Id. (opining that the employer must take "active steps to ascertain the dictates of the FLSA and then act to comply with them" to establish good faith).  If the defendant fails to rebut the presumption that it acted willfully, the plaintiff is generally entitled to double recovery.  Under prevailing case law, a FLSA violation is willful if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute."  Id. at 141

(citation omitted). Additionally, if the plaintiff proves willfulness, the FLSA's statute of limitations extends back three years instead of two years. 29 U.S.C. § 255(a); Herman v. RSR Sec. Servs. Ltd., 171 F.3d at 141.

B. Analysis

In seeking judgment as a matter of law on the FLSA claim, the Senecas make two arguments. The Senecas first argue that plaintiff failed to offer sufficient evidence for a jury to find that defendant Seneca is an "enterprise engaged in commerce or in the production of goods for commerce." (Defs.' Mot. at 3). Specifically, the Senecas argue that the jury did not have a sufficient basis to find that the Company had gross sales in excess of $500,000. (Id.) This argument was not raised at trial before the jury, although it was raised in passing outside of the jury's presence.[7] (See Tr. at 1330). The Senecas' second argument is that no reasonable jury could have found that any alleged FLSA violation was willful. (Id.) Based on a review of the evidence and drawing all reasonable inferences in plaintiff's favor, the Court finds that judgment as a matter of law in favor of the Seneca defendants is not warranted.

1. FLSA Coverage

---

[7]The Court notes that the Senecas' post-trial brief limits its discussion of the issue to one conclusory paragraph. (Defs.' Mot. at 3). As set forth in detail below, the jury was asked in the special interrogatories whether plaintiff was "employed by an enterprise engaged in commerce or the production of goods for commerce." Not only was there sufficient evidence in the record to support the jury's finding, but the Court is hard-pressed to see how the jury could have found other than it did.

Turning to the Senecas' first argument, the Court is satisfied that the jury reasonably could have found that the defendants were an "enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 203(s). Indeed, the trial record is replete with evidence of the nature and volume of the defendants' business that would allow a reasonable jury to find that defendants' "annual gross volume of sales made or business done is not less than $500,000." Id.; see also Falk v. Brennan, 414 U.S. 190, 198 (1973) (noting that by adding the phrase "business done," Congress broadened the scope of FLSA coverage). Plaintiff presented evidence that the Seneca defendants employed multiple workers and that the Company was hired to perform work as a general contractor on numerous projects for the City that were budgeted for hundreds of thousands of dollars. (See, e.g., Tr. at 417-18; Pl.'s Ex. C). For instance, the Seven Corners project was budgeted for at least $345,999, the Tabernacle project for at least $330,000, and the NAACP project for at least $92,000. (Pl.'s Exs. C, E).

Moreover, Carlos Seneca admitted that he has had over 60 jobs in the last ten years. (See Tr. at 417). He further admitted that the Seven Corners project, which he recalled cost between $400,000 and $600,000, was not a fairly large project "on [his] scale." (Tr. at 418). The trial record also contains evidence of bids by Seneca topping seven figures (see, e.g., Pl.'s Ex. D), and the defendants' own payroll records show substantial sums remitted to workers during each pay period. (See Pl.'s Ex. Q).

Given the totality of this evidence and the absence of any proof by the Senecas that their

"annual gross volume of sales or business done" was less than $500,000,[8] the jury reasonably concluded that the Seneca defendants were subject to coverage under the FLSA.

2. Willfulness

With respect to defendants' argument that the jury had no reasonable basis to conclude that any FLSA violations were willful, the Court finds otherwise.  Considering the entirety of the record, and giving due regard to the jury's evaluation of the credibility of the witnesses, and the relationship of the parties, among other evidence, this Court is satisfied that the jury could reasonably have inferred willful action on the part of the defendants in failing to comply with the FLSA.  As noted above, the employer has the burden to prove that it acted in good faith, meaning that "[t]he burden is on an employer properly to record hours, and an employee need only as a *prima facie* matter present an estimate of damages that is satisfactory as 'a matter of just and reasonable inference.'"  Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687 (1946).

In this case, the jury could have considered the Company's lack of accurate time and payroll records, combined with the inability of either of the two Company principals to explain the records that were produced or even describe the bookkeeping practices of their family Company, as sufficient evidence of willful action on the part of the defendants.  Perhaps most telling was the testimony of Anthony Seneca that the time sheets tracking each employee's hours

---

[8]In fact, the Senecas cite nothing in support of their argument, failing to even provide any reference to the trial transcript.

were often written on a "napkin" or on "a piece of plywood." (Tr. at 565).

Indeed, the employee time sheets that were shown to the jury were largely illegible and listed employees only by nicknames such as "Red," "Father," and "Cousin Carlo." (Id. at 564-67, 979; Pl.'s Ex. 16). Moreover, when asked about bookkeeping and accounting, Carlo Seneca denied any knowledge and suggested that such information was handled by an office manager whom he identified only as "Lori," but Lori was no longer a Company employee. (Tr. at 410). Sara Sharp, an employee of the Company since 1999, testified that Company employees often "got cash" in envelopes in lieu of formal paychecks. (Id. at 967, 978, 992-93). The jury could have also considered the lack of detail and certainty in the testimony of Steven Bowen and Anthony Sgroi, employees of the accounting firm of Shultheis & Panettieri, regarding the records they reviewed from the Company in conducting their audits. (See, e.g., id. at 1232). As a result, the jury heard no testimony that could adequately explain the Company's time records.

Furthermore, the Company was not able to produce many payroll records at trial because, as Anthony Bruno testified, all files related to any Company project from 2000 or earlier had probably been thrown out (id. at 922-23), and construction at his own office in 2004 left very few employment or overtime records of Company projects completed prior to 2004. (Id. at 922-25). Sara Sharp similarly testified that all payroll records from before September 1999 had been destroyed by a former employee. (Id. at 967, 978, 992-93). Carlo Seneca was not even able to identify the last name of one of the primary individuals who maintained the Company's books. (Id. at 410).

The fact that neither of the Senecas could provide information explaining how the

accounting and bookkeeping records were kept, coupled with the testimony of the Company's accountant and office manager acknowledging the inadequacy of the Seneca records, supports a reasonable inference that the Company disregarded its obligations under the law to pay the required overtime. Indeed, the fact that the Union had successfully demonstrated that the Company had failed to pay plaintiff all of the wages due to him and had obtained an arbitration award reimbursing plaintiff for 56 hours of unpaid wages provides added support for the jury's conclusion that the Company willfully disregarded its obligations under the law and owed plaintiff overtime wages under the FLSA. (See Stip. ¶ 25).

Under these circumstances, defendants have failed to rebut the presumption that they acted willfully. Accordingly, the Seneca defendants' motion for judgment notwithstanding the verdict on plaintiff's FLSA claims is denied, and the Court awards plaintiff liquidated damages on his FLSA claims.

### 3. Damages

#### a. Damages Under the FLSA & NYLL

The Seneca defendants ask this Court to reduce the jury verdict of $12,000 in overtime pay because it "represents duplicative damages for the same overtime pay Plaintiff was allotted under both State and Federal Law." (Defs.' Mot. at 4). Although the Seneca defendants do not otherwise appear to challenge the jury's finding that hours were owed under the FLSA and NYLL, nor do they appear to challenge the jury's method of calculating damages under those statutes, they argue that the jury awarded overtime pay for the same hours under both federal and

state law, resulting in a windfall for plaintiff.

The NYLL mirrors the FLSA in that it also requires overtime pay at one and a half times the regular hourly rate for hours worked in excess of 40 hours in a week.  See N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2; Noble v. 93 Univ. Place Corp., 303 F. Supp. 2d 365, 376 (S.D.N.Y. 2003).  Since the statutes are both compensatory, awarding overtime pay for the same hours worked may lead to double recovery.  See Jin v. Pac. Buffet House, Inc., No. 06 CV 579, 2009 WL 2601995 at *7 n.3 (E.D.N.Y. Aug. 24, 2009).

The Verdict Form reveals that the jury awarded plaintiff $12,000 in overtime.  (Jury Verdict Form, at 1-6, 25-26).  On the Verdict Form, the jury was asked to indicate the period covered by their award.  According to the Verdict Form, the jury awarded plaintiff $5,000 in damages for a willful violation of the FLSA, covering the period running from September 5, 1998 to June 5, 2000,[9] and $7,000 in damages under the NYLL for the period running from March 3, 1998 to June 3, 2000, for a total of $12,000 in damages.  (Id.)

As a result, the Seneca defendants are correct that the total jury award of $12,000 was based on a jury finding that the Seneca defendants violated both the federal and state overtime

---

[9]The Court instructed the jury that upon a finding of willfulness, the jury may award damages under the FLSA beginning on September 5, 1998.  (Tr. at 1541).  Neither party requested an instruction to the jury on the statute of limitations under the NYLL, but the Court notes that the statute of limitations under the NYLL is six years.  See N.Y. Lab. Law § 198(3).  As a result, the amount the jury awarded under the NYLL, but not the FLSA, for the time period running from March 3, 1998 to September 4, 1998, is not inconsistent with the Court's instruction.

statutes.[10]  Since the time period giving rise to both the state and federal law violations is overlapping, entering judgment on the full $12,000 would unjustly give rise to double recovery by plaintiff.  See, e.g., Roman v. Maietta Constr., Inc., 147 F.3d 71, 78 (1st Cir. 1998) (holding that plaintiff cannot seek monetary compensation under both the FLSA and similar state provision for the same hours).

Accordingly, the Court upholds the jury award of $5,000 for the defendants' FLSA violation running from September 5, 1998 until May 5, 2000.  However, because this period overlaps with the jury's award under the NYLL, the Court must reduce plaintiff's recovery under the state law provisions for that same period to prevent double recovery on the same hours worked.  Accordingly, the jury award is hereby reduced so that it includes damages under the NYLL only for the time period running from March 3, 1998 to September 4, 1998, and under the FLSA for the period running from September 5, 1998 to June 5, 2000.  Since the jury awarded damages under both statutes for the period from September 5, 1998, to June 3, 2000, the Court has subtracted the amount awarded under the NYLL covered by that time period.  In total, the amount awarded for these two periods equals $5,000 in FLSA damages, plus $1,580.10 in NYLL

---

[10]Although the Court cannot inquire into the internal jury deliberations in these circumstances, it appears that the jury determined the award of $12,000 by multiplying Mr. Mazza's hourly wage rate of $18.75 as listed on defendants' payroll records (see, e.g., Pl.'s Ex. P), by 826 days, which is the number of days during the period running from March 3, 1998 until June 5, 2000, effectively awarding plaintiff an hour of back pay for each day on average, and then subtracting from that figure the arbitration award of $3,025.68 that plaintiff received prior to this litigation.  This calculation results in a total award of approximately $12,000.

damages for the period prior to September 5, 1998, for a total jury award of $6,580.10.[11]

### b.  Liquidated Damages

In addition to the jury award of $5,000 under the FLSA, and the reduced jury award of $1,580.10 under the NYLL, plaintiff is also entitled to an additional amount in the form of liquidated damages because the jury found that the defendants acted willfully.  Indeed, upon a finding of willfulness, plaintiff is entitled to receive double the amount of damages awarded by the jury for the FLSA claims under federal law, 29 U.S.C. §§ 216(b), 260, and an additional 25% of the amount of damages awarded for NYLL claims under New York law, which also provides for an award of liquidated damages.  N.Y. Lab. Law § 198.  As a result, the Court adds liquidated damages to the revised jury award for a total judgment of $11,975.13, reflecting total damages of $10,000 under the FLSA and $1,975.13 under state law.

### c.  Prejudgment Interest

Plaintiff is also entitled to prejudgment interest.  The decision to award prejudgment

---

[11]Since the Court is unable to determine the exact numbers that the jury used to calculate the award and may not inquire into the internal jury deliberations in these circumstances, the Court has calculated the $1,580.10 figure by dividing the total jury award under state law ($7,000) by the number of days in the period running March 3, 1998 until June 3, 2000 that gave rise to the state law violation (824 days) to reach a per day damage figure of $8.4951456 during the relevant period.  After eliminating the overlapping hours, there remained 186 days for which plaintiff is entitled to state law overtime damages encompassing the period running from March 3, 1998 to September 4, 1998, for a total state law award of $1,580.10.

interest is "ordinarily left to the discretion of the district court." Gierlinger v. Gleason, 160 F.3d 858, 873 (2d Cir. 1998). However, "[t]o the extent . . . damages awarded to the plaintiff represent compensation for lost [back] wages, 'it is ordinarily an abuse of discretion not to include prejudgment interest.'" Id. at 873-74 (quoting Saulpaugh v. Monroe Comty. Hosp., 4 F.3d 134, 145 (2d Cir. 1993), cert. denied, 510 U.S. 1164 (1994)).

In determining the amount of prejudgment interest to award, the Court must first determine the appropriate interest rate to apply. For judgments based on New York law, a plaintiff is entitled to prejudgment interest at the rate of 9% per annum pursuant to N.Y.C.P.L.R. §§ 5001, 5004. When liability exists under both the FLSA and NYLL, it is more appropriate to use the federal interest rate provided in 28 U.S.C. § 1961(a). See Cioffi v. New York Cmty. Bank, 465 F. Supp. 2d 202, 222 (E.D.N.Y. 2006) (holding that "in cases where the judgment is based on violations of both state and federal law, it is common practice in the Second Circuit to apply the federal interest rate pursuant to 28 U.S.C. § 1961(a)"); Kuper v. Empire Blue Cross & Blue Shield, No. 99 CV 1190, 2003 WL 23350111 at *3-6 (S.D.N.Y. Dec. 18, 2003).[12] Although Section 1961(a) requires that courts use the "weekly average 1-year constant maturity Treasury yield," this Court has used the average annual rate to calculate interest since most courts use the "average annual—not weekly—rate of return on one-year T-bills between the time the claim arises and the entry of judgment." Kuper v. Empire Blue Cross & Blue Shield, 2003 WL 23350111 at *5.

---

[12]Some courts, however, have held differently. In Heng Chan v. Sung Yue Tung Corp., for instance, the court held that: "Prejudgment interest may be awarded on state claims pursuant to N.Y. C.P.L.R. § 5001 even where liability is also found under the FLSA." No. 06 CV 6048, 2007 WL 1373118 at *9 (S.D.N.Y. May 7, 2007) (citing Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d 327, 342 (S.D.N.Y. 2005)).

In this case, plaintiff's award of prejudgment interest depends on both the New York and federal methods for calculating interest. First, for the 186-day period running from March 3, 1998 until September 4, 1998, in which the jury found that defendant violated only New York law, plaintiff is entitled to 9% per annum in prejudgment interest, which equals $3,555.41, as detailed in the table below.

| Relevant Period | Midpoint | Judgment | Interest Rate | Days to present | Total Interest |
|---|---|---|---|---|---|
| 3/3/98 - 9/4/98 | 6/4/98 | $1,975.13 | 9% | 4361 | $3,555.41 |

Second, for the 640-day period running from September 5, 1998 until June 5, 2000, in which the jury found that defendant violated both federal and state law, plaintiff is entitled to interest at the average annual rate of return on one-year T-bills, which equals $7,511.69, as detailed in the table below.[13]

| Year | Relevant Period | Midpoint | Number of Days | Unpaid Wages (Days x $15.625) | 1 Year Constant Maturity T-Bill Interest Rate | Number of days to present | Total Interest |
|---|---|---|---|---|---|---|---|
| 1998 | 09/05/98 - 12/31/98 | 11/3/98 | 118 | $1,843.75 | 5.05 | 4209 | $1,410.43 |
| 1999 | 01/01/99 - 12/31/99 | 7/3/99 | 365 | $5,703.13 | 5.08 | 3967 | $4,069.09 |

---

[13]The Court calculated the unpaid wages in each year by dividing the total FLSA award ($10,000) by the number of days in the period giving rise of the FLSA violation (640 days) to arrive at a per day damage figure of $15.625. As explained supra at footnote 11, the Court cannot inquire into the internal jury deliberations in these circumstance and will assume that the FLSA violations were evenly distributed throughout the relevant period. The Federal Interest Rate comes from the 1-year constant maturity Treasury yield interest rates, which can be found at: http://www.federalreserve.gov/RELEASES/H15/data/ Annual/H15_TCMNOM_Y1.txt.

| 2000 | 01/01/00 - 06/05/00 | 157 | $2,453.13 | 6.11 | 3714 | $2,032.17 |
|------|---------------------|-----|-----------|------|------|-----------|
| Total | | | | | | $7,511.69 |

In summary, the Court has increased the reduced jury award of $6,580.10 by adding statutory liquidated damages of $5,395.03 and prejudgment interest of $7,511.69 for a total award of $19,486.82

II.  Plaintiff's Motion Under Rule 59

Plaintiff challenges the jury verdict as against the weight of the evidence and as a miscarriage of justice, contending that the jury disregarded the Court's instructions and erred as a matter of law in finding for defendants on plaintiff's other claims.  Accordingly, plaintiff "seeks an order from this Court to either set aside the jury's verdict and for a new trial, or in the alterative, for this Court to reconsider the weight of the evidence, which is contrary to the jury verdict, or to alter or amend the judgment pursuant to the weight of the evidence against the defendants and for sanctions or other adverse inference based on defendants' spoliation of evidence."  (Pl.'s Mem.[14] at 2).

A.  Legal Standard

1.  Rule 59 of the Federal Rules of Civil Procedure

Rule 59 of the Federal Rules of Civil Procedure permits the trial court in its discretion to

_____

[14]Citations to "Pl.'s Mem." refer to Plaintiff's Memorandum of Law in support of his post-verdict motion, dated October 6, 2008.

order a new trial. Fed. R. Civ. P. 59(a). Unlike a motion for judgment as a matter of law, the trial court may grant a new trial even where the jury's verdict is supported by substantial evidence. Song v. Ives Labs., Inc., 957 F.2d at 1047; Bevevino v. Saydjari, 574 F.2d 676, 683-84 (2d Cir. 1978). Additionally, a trial judge is free to weigh the evidence, and is not required to view the evidence in the light most favorable to the verdict winner. See DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998); Bevevino v. Saydjari, 574 F.2d at 684.

A trial judge may grant a new trial motion if he or she determines that "the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice, i.e., that the verdict is against the weight of the evidence, that the damages awarded were excessive, or that for stated reasons the trial was not fair to the moving party." Mallis v. Bankers Trust Co., 717 F.2d 683, 691 (2d Cir. 1983) (internal quotations and citations omitted). The Second Circuit has held that the trial judge should view the verdict in light of the overall setting of the trial, should consider the character of the evidence, as well as the complexity or simplicity of the legal issues that the jury was asked to consider, and should decline to interfere with the jury's verdict unless it is quite clear that a seriously erroneous result was reached. See Bevevino v. Saydjari, 574 F.2d at 684.


2. Retaliation Under FLSA & NYLL

The FLSA and NYLL provide "nearly identical" protections to employees against termination or other adverse employment action in retaliation for initiating certain actions against the employer. See Lai v. Eastpoint Int'l, Inc., No. 99 CV 2095, 2000 WL 1234595, at *3

n.3 (S.D.N.Y. Aug. 31, 2000). The FLSA makes it "unlawful for any person . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding . . . ." 28 U.S.C. § 215(a)(3). Similarly, New York law provides that "no employer . . . shall discharge, penalize, or in any other manner discriminate against any employee because such employee has caused to be instituted a proceeding . . . ." N.Y. Lab. Law § 215. To allege a claim of retaliation under the FLSA or NYLL, a plaintiff must show "1) participation in protected activity known to the defendant; 2) an employment action disadvantaging the plaintiff; and 3) a causal connection between the protected activity and the adverse employment action. Lai v. Easpoint Int'l, Inc., 2000 WL 1234595, at *3 (citing Cruz v. Coach, 202 F.3d 560, 566 (2d Cir. 2000)).

    B. Jury Verdict

    Here, the jury found that plaintiff had not carried his burden to prove his claims of retaliation under the FLSA and the NYLL, his claims for prevailing wages under the NYLL, or his claims under the CBA against either the Seneca defendants or the Union. Plaintiff now challenges the jury's findings and asks the Court for post-verdict relief. As explained below, the Court declines to grant such relief because the Court is not convinced that the jury has reached a seriously erroneous result, nor is the Court convinced that the verdict represents a miscarriage of justice. Instead, after reviewing the record, the Court is confident that the jury carefully considered the evidence and rendered a verdict that was reasonable in light of the evidence.

1.  <u>Retaliation Claims Under FLSA and NYLL</u>

Plaintiff first argues that the jury's finding that the Seneca defendants did not retaliate against plaintiff for purposes of the FLSA and NYLL is contrary to the weight of the evidence. (Pl.'s Aff.[15] at 4). In support of his contention that he was terminated in retaliation for getting a Union card, plaintiff cites the trial testimony of Anthony Seneca, who, when asked if he thought plaintiff had gone behind the Senecas' back to get a Union card, responded, "I think that was devious . . . . it was part of your scam, to get into the Union to start trouble." (Tr. at 688). Plaintiff further points to the testimony of Christopher Wallace, contending that he testified that the argument on June 5, 2000 between plaintiff and the Senecas "had something to do with plaintiff getting a Union card." (Pl.'s Aff. at 3 (citing Tr. at 770-71)). Plaintiff contends that this testimony directly contradicts the stipulated fact that plaintiff "was terminated" on June 5, 2000. (Pl.'s Aff. at 8-9). Based on any reading of this testimony, plaintiff argues, no reasonable jury could have found for defendants on plaintiff's retaliation claims. For this reason, plaintiff further claims that "[i]t is clear that the jury did not follow the [judge's] instructions." (<u>Id.</u> at 6).

As noted above, to prevail on a claim of retaliatory discharge under either the FLSA or NYLL, plaintiff must prove, <u>inter alia</u>, the "existence of a causal connection between his protected activity and the adverse employment action." <u>Lai v. Eastpoint Int'l, Inc.</u>, 2000 WL 1234595, at *3 (citing <u>Cruz v. Coach</u>, 202 F.3d at 566). Although plaintiff presented evidence to support his contention that he was terminated because he engaged in protected union activity,

_____

[15]Citations to "Pl.'s Aff." refer to Plaintiff's Affirmation in Support of Plaintiff's Motion, filed on October 6, 2008.

this evidence was by no means uncontradicted. Thus, although the parties did not dispute that plaintiff's employment ended on June 5, 2000, as stipulated, there was evidence from defendants that the jury could have reasonably credited to find that plaintiff was not fired for his Union activity but left the work site and never returned after engaging in conduct that plaintiff acknowledged was "insubordinate." (See Tr. at 1135). Thus, plaintiff's employment ended or "terminated" when he failed to return to work after that day.

The jury reasonably could have credited the evidence tending to show that defendants did not retaliate against plaintiff for his protected activity. Carlo Seneca, for instance, testified that he did not fire plaintiff on account of his protected activities; indeed, he claimed that an employee's decision whether to join a union is of no concern to his Company. (Tr. at 1380). Christopher Wallace echoed this testimony by recalling that the Senecas did not have any problem with other workers on the Holy Rosary job receiving Union cards. (Id. at 765-66). Moreover, the Senecas testified that plaintiff's termination was due to his own behavior. In this regard, Carlo Seneca testified, and Joseph Gershom confirmed, that plaintiff, on the morning of June 5, 2000, attempted to fire two Company employees when he had no authority to do so. (Id. at 470). This is consistent with testimony that indicated that plaintiff often fought with the Senecas, and had been noted for poor work quality and using alcohol and drugs on the job. (Id. at 570-73). Moreover, plaintiff admitted that at least one of his actions – refusing to work while a certain painter he had formerly fired was on the site – amounted to "[i]nsubordination." (Id. at 1135).

Finally, plaintiff's suggestion that the jury erred in its verdict because the Seneca

defendants contradicted a stipulated fact is without merit.  First, the stipulation in question specifies merely that plaintiff "was terminated."  (Stip. ¶ 14).  The jury may reasonably have determined that the testimony that plaintiff was not fired for participating in protected Union activities was not inconsistent with the stipulated fact because plaintiff stormed off the work site on June 5, 2000 and refused to return to work, thus resulting in the termination of his employment.  (Tr. at 475).  Second, even if the testimony plaintiff cites is inconsistent with the stipulated fact,[16] this inconsistency does not preclude the jury from finding that the defendants did not retaliate against plaintiff; indeed, plaintiff has failed to show to show the relevance of this contradiction in the context of his post-verdict motion.  Plaintiff had the burden at trial to prove not only that the defendants terminated or otherwise disadvantaged him, but also that he "participat[ed] in protected activity known to the defendant" and that there was "a causal connection between the protected activity and the adverse employment action."  Lai v. Eastpoint Int'l, Inc., 2000 WL 1234595, at *3 (citing Cruz v. Coach, 202 F.3d at 566).  The jury reasonably could have found that plaintiff failed to satisfy this test.  Giving deference to the jury's assessment of the credibility of the evidence, the Court finds that post-verdict relief is warranted on the retaliation claim.


## 2. Prevailing Wage Claim Under the NYLL

---

[16]As the Court instructed the jury, "[T]o to the extent that the parties have stipulated to a particular fact, you must accept the stipulated fact as true, but it remains for you to determine what weight to accord this evidence."  (Tr. at 1502).  Nothing suggests that the jury did not adhere to this instruction.

Plaintiff also contends that the jury erred in failing to find that he was entitled to receive prevailing wages under the NYLL. To this end, plaintiff argues that it was "clearly established that plaintiff was not only a foreman, [but] also a painter, carpenter and laborer, that he basically did everything on the public works projects." (Pl.'s Aff. at 6). This work presumably included "tenant" work for which plaintiff should have received a prevailing wage. (Id.) Plaintiff requests relief from the verdict, arguing that "the evidence is clear that the jury did not follow the instructions as to the 'evidence' which clearly documents that at least some of the time plaintiff worked on the 'tenant' portion of the public works contracts," and therefore would have been entitled to receive prevailing wages for this work. (Id.)

As a preliminary matter, the Court notes that the difference in performing "tenant" work as opposed to "landlord" work on public projects is significant. New York law requires a company to pay prevailing wages to all workers performing "tenant" work, while a Company need not do so for workers performing "landlord" work.[17] (Tr. at 452). At trial, it was undisputed that skilled laborers, such as carpenters, including those who install tile and wall moulding, frame walls and perform sheetrocking, generally perform "tenant" work, while lesser skilled laborers, such as painters and cleaners, generally perform "landlord" work. (Id. at 413,

_____

[17]See N.Y. Lab. Law § 231 (requiring employers to pay "prevailing wages" on projects funded with public money). Although Section 231 does not distinguish between "landlord" work and "tenant" work, the parties do not appear to dispute that in this case, "landlord" work was funded with private money, while "tenant" work was funded with public money. This comports with the practice of the Senecas, whereby they would execute both a "landlord" work contract and a "tenant" work contract for the same job. Compare Defs.' Ex. 5-Q ("tenant" work contract, requiring payment of prevailing wages) with Defs.' Ex. S-P ("landlord" work contract, containing no provision for the payment of prevailing wages). As such, for purposes of this case, defendants were required to pay prevailing wages on "tenant" work, not on "landlord" work.

418, 1016; CBA at 2-6; <u>see also</u> <u>supra</u> note 17).  Against this background, plaintiff argues that at least some of his work on the public projects fell within the category of skilled labor and as a consequence would be considered "tenant" work entitling him to a prevailing wage.

Although plaintiff worked largely as a painter and unskilled laborer during his time with the Company (<u>see, e.g.</u>, <u>id.</u> at 49, 166-67, 259, 413), plaintiff testified that he also worked as a carpenter, performing tasks that included tile work and sheetrocking.  (<u>Id.</u> at 1015-20, 1287-88, 1291).  Plaintiff further claimed that he obtained a Union card indicating that he was a carpenter. (<u>Id.</u> at 1034-35; Pl.'s Ex. 57).  Plaintiff's testimony was corroborated by that of his wife, Stephanie Mazza (Tr. at 30), shop steward reports from the Holy Rosary site (Pl.'s Ex. 34), as well as the testimony of Thomas Paladino (Tr. at 258-59), Zadie Davis (<u>id.</u> at 49), and Vincent Impeduglia.  (<u>Id.</u> at 273).  To further support his argument, plaintiff submitted into evidence a check issued by the Company on behalf of plaintiff to the New York City District Council of Carpenters Vacation Fund in the amount of $287.40 for 81 hours worked during a period ending December 31, 2000, ostensibly for the purpose of proving that the Company considered him to be a carpenter.  (Pl.'s Ex. 78).

Notwithstanding plaintiff's evidence, much evidence exists to the contrary about the nature and scope of plaintiff's work for the Company.  Christopher Wallace and Lionel O. Williams testified that there was a distinction between simply performing carpentry tasks and being considered a carpenter for employment purposes; to be considered a carpenter, one would need certain training and experience, which plaintiff appeared not to have.  (Tr. at 727, 740, 812).  Moreover, while Anthony Seneca conceded that plaintiff may have performed some,

limited carpentry work (see, e.g., id. at 576), Carlo Seneca testified that even if plaintiff had been "doing carpentry" tasks or was "trying to learn carpentry," he was still not considered to be a carpenter for employment purposes. (Id. at 577-78). Indeed, according to Carlo and Anthony Seneca, the Company hired plaintiff only as a painter and laborer; even if plaintiff performed carpentry work, it was limited to incidental tasks at the Holy Rosary site and was not performed at the request of the Senecas. (Id. at 505, 575-76, 577-78).

Joseph Gershom confirmed Carlos Seneca's testimony, stating that he tried to prevent plaintiff from performing sheetrocking at the Holy Rosary project, but plaintiff would nonetheless attempt to "sneak back inside" to do carpentry work. (Id. at 1076, 1079). Wallace further testified that, based on his interviews with Company workers, plaintiff had rarely engaged in carpentry work. (Id. at 878, 899). Additionally, Zadie Davis testified that she witnessed plaintiff working on stilts at the Tabernacle project (id. at 48); only workers considered to be painters or plasterers would own such stilts, according to Christopher Wallace. (Id. at 901). This is especially damaging to plaintiff because plaintiff admitted that workers designated as carpenters would not have performed any non-carpentry tasks on a job site. (Id. at 1291). Not only did Ms. Davis witness plaintiff performing non-carpentry tasks, but also plaintiff admits to having performed many such tasks while working at Company projects. (Id.)

Based on the jury's evaluation of the conflicting evidence, and the need to assess the credibility of the various witnesses, the jury could reasonably have concluded that plaintiff was not a carpenter and thus not entitled to receive prevailing wages based on his work at the public works projects. The jury reasonably could have credited the testimony of Anthony Seneca,

Christopher Wallace, Joseph Gershom, and plaintiff himself, among others, to conclude that even if plaintiff performed certain "carpentry" tasks, he was not specifically hired as a carpenter, was not necessarily qualified to perform such work and did the work on his own initiative and not at the request of defendants. Thus, the jury could have reasonably concluded that plaintiff did not perform "tenant" work on the public projects that would entitle him to a prevailing wage. The verdict was neither an erroneous result nor a miscarriage of justice. It was a reasonable resolution of conflicting evidence presented at trial.

### 3. Jury Instructions

With regard to the Jury Instructions, plaintiff claims that he was entitled to a charge "pursuant to union scale wages based on the time period the collective bargaining agreement was in effect regarding all the public works projects." (Pl.'s Aff. at 10). Essentially, plaintiff appears to argue that the jury should have been instructed that the CBA covered all construction projects on which plaintiff performed work for the Senecas, thus entitling him to Union wages. However, the Court instructed the jury that they must find the existence of a CBA "between the Union and Seneca during the relevant period of time that governs the terms of plaintiff's employment" before they may impose liability on the defendants. (Tr. at 1534). It is the province of the jury to determine the existence of the CBA at each relevant period of time.[18]

---

[18]More importantly, the jury reasonably could also have concluded that plaintiff was not performing work as a carpenter during the period in which it found that he was entitled to damages. See discussion supra at pages 37-41. Thus, he would not be entitled to receive Union wages under the CBA, which related only to carpenters. Such a determination would render the scope of the CBA irrelevant for purposes of computing damages during the relevant period.

Indeed, conflicting evidence was presented about the scope of the CBA. Carlo Seneca testified that the Company understood that the CBA would apply only to the Holy Rosary project (id. at 431-33, 436), while Denis Shiel testified that the obligations of the CBA extended beyond the Holy Rosary project and required the Company to pay union wages to all carpenters it employed on any joint venture within the Union's geographic jurisdiction, an area that included all of the Company's day care projects. (Id. at 110, 117, 820). Shiel further testified that although the CBA applied all wage and benefit obligations retroactively to July 1, 1996, these were not applicable to any work performed by the Company prior to August 12, 1999. (Id. at 140-42, CBA at 49). The jury reached a reasonable finding in weighing this conflicting evidence, and determining the existence and scope of the CBA.

### 4. Damages

Finally, with regard to damages, plaintiff argues that the jury verdict was against the weight of the evidence because no reasonable jury could have calculated damages for the public works projects because defendants "did not submit any evidence as to the end dates to any of these projects . . . ." (Pl.'s Aff. at 11). Plaintiff also questions the ability of the jury to "produce

---

Although Wallace determined that plaintiff was owed 56 hours of pay for carpentry work performed at the Holy Rosary project (Tr. at 835), and plaintiff submitted evidence of a payment from the Company to the New York City District Council of Carpenters Vacation Fund on plaintiff's behalf in consideration of either 56 or 81 hours worked (Pl.'s Ex. 78; see also Tr. at 1064-71), this evidence did not preclude the jury from finding that plaintiff was not otherwise performing work as a carpenter during the relevant period. Indeed, the jury reasonably could have found that the payment by the Company for 56 hours worked adequately compensated plaintiff for any and all carpentry work he might have performed for the Company.

a true and accurate amount [of damages] based on overtime with falsified time sheets and trained testimony . . . ." (Id. at 9). The Court rejects these arguments because enough evidence exists, including the time sheets, the shop steward reports and the audit records, combined with the detailed testimony at trial, to form the basis of the jury's calculation of damages. Although plaintiff need not have proved damages with specificity, plaintiff had the burden to prove damages for each of his claims, see, e.g., O'Brien v. Ed Donnelly Enters. Inc., 575 F.3d 567, 602-03 (6th Cir. 2009), and, in the absence of any specific testimony from plaintiff about the scope of his hours worked, the jury reasonably calculated damages based on the evidence before them. Although plaintiff argues that the jury's calculation of damages was incorrect, he provides no basis for determining how to calculate a different award. He fails to point to any evidence that the jury ignored; indeed, given the paucity of evidence available to the jury, the Court finds that the verdict rendered was reasonable.

C. Spoliation

Plaintiff also asks this Court to reconsider its prior ruling on defendants' alleged spoliation of evidence in light of the evidence presented at trial. Specifically, plaintiff argues: 1) that defendants provided him with false timesheets; 2) provided him with an illegitimate Collective Bargaining Agreement dated 1990 to 1993; and 3) failed to produce the CBA that was in effect from 1993-1996. (Pl.'s Mem. at 8-10). With regard to the 1990-1993 CBA, plaintiff claims that defendants provided him with this illegitimate agreement "with the intention to withhold or hide that a true collective bargaining agreement existed." (Id. at 11). As a result,

plaintiff contends that the Court should have imposed sanctions upon the defendants, including "an adverse inference in the jury instructions/charges as to the false documentation provided" or an instruction that certain evidence was lost, misplaced, or destroyed.  (Id. at 10).

### 1.  Legal Standard

Rule 37 of the Federal Rules of Civil Procedure authorizes a court to impose various sanctions when a party "fails to obey an order to provide or permit discovery."  Fed. R. Civ. P. 37(b)(2); see also Transatlantic Bulk Shipping Ltd. v. Saudi Chartering, S.A., 112 F.R.D. 185, 189 (S.D.N.Y. 1986) (noting that Rule 37(b) "provides for sanctions where a party fails to honor its disclosure obligations, especially after court orders").  It is clear that sanctions may be imposed when a party spoliates evidence in violation of a court order.  See, e.g., West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999) (citing John B. Hull, Inc. v. Waterbury Petroleum Prods., Inc., 845 F.2d 1172, 1176 (2d Cir. 1988)).  Even where there has been no explicit discovery order issued, the court has the inherent power to preserve the integrity of proceedings by, among other things, imposing sanctions for the spoliation.  See id.; Kronisch v. United States, 150 F.3d 122, 126-27 (2d Cir. 1998), cert. denied, 531 U.S. 1078 (2001); Barsoum v. N.Y.C. Hous. Auth., 202 F.R.D. 396, 399 (S.D.N.Y. 2001).

The Second Circuit has defined spoliation as "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  West v. Goodyear Tire & Rubber Co., 167 F.3d at 779; accord Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93, 107 (2d Cir. 2001).  A party has

the obligation to preserve evidence when the party is on notice "that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Fujitsu Ltd. v. Federal Express Corp., 247 F.3d 423, 436 (2d Cir. 2001) (citing Kronisch v. United States, 150 F.3d at 126), cert. denied 534 U.S. 891 (2001); Barsoum v. N.Y.C. Hous. Auth., 202 F.R.D. at 400 (holding that a party is under an obligation to retain documents and other evidence that it knows may be relevant to a pending or future litigation). This obligation to preserve relevant documents exists whether or not the documents have been specifically requested in a demand for discovery. See Barsoum v. N.Y.C. Hous. Auth., 202 F.R.D. at 400.

A party seeking sanctions for spoliation of evidence must establish that three elements are present:

> 1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; 2) that the records were destroyed with a culpable state of mind; and 3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002); Farella v. City of New York, No. 05 CV 5711, 2007 WL 193867, at *2 (S.D.N.Y. Jan. 25, 2007); see also Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d at 108-09; Fujitsu Ltd. v. Federal Express Corp., 247 F.3d at 436; Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 220 (S.D.N.Y. 2003). It is unclear exactly what degree of culpability is required under the second prong of the test; some courts in this Circuit have required a showing of bad faith, some have required proof of

intention destruction, and others have drawn an inference based on gross negligence.  See

Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d at 107-08 (citing Reilly v. Natwest Mkts.

Group Inc., 181 F.3d 253, 267 (2d Cir. 1999), cert. denied, 528 U.S. 1119 (2000)).  Thus, the

Second Circuit has concluded that "a case by case approach is appropriate."  Byrnie v. Town of

Cromwell, Bd. of Educ., 243 F.3d at 108.


    2.  Analysis

After reviewing the trial record, the Court once again denies plaintiff's request for

sanctions and holds that plaintiff was not entitled to an adverse inference charge.  In support of

his argument that the 1990-1993 agreement was fraudulent, plaintiff misconstrues the testimony

of Denis Sheil.  While plaintiff argues that "at trial[] the witness Denis Sheil . . . testified [that

the agreement] was illegitimate" (id. at 9), the trial transcript reveals that Sheil merely

"guess[ed]" that it was not legitimate and explicitly stated, "I don't know if this contract is a

legitimate contract."  (Tr. at 145).  With regard to the timesheets, plaintiff offered no convincing

evidence that the time sheets were fraudulent.[19]  Finally, with regard to the alleged 1993-1996

agreement, plaintiff has failed to prove that such an agreement actually existed.  Indeed,

witnesses testified that no such agreement existed.  (See, e.g., Tr. at 518).  In any event, the two

CBAs are of such limited relevance that the Court finds that even if the 1990-1993 agreement

was false, and the defendants withheld the alleged 1993-1996 agreement, failure to provide an

---

[19]To the extent plaintiff seeks sanctions based on the Seneca defendants' failure to
maintain adequate employment records, the Court already addressed the issue in a Memorandum
and Order, dated July 2, 2008.

adverse inference in this case would be harmless error.  See Fed. R. Civ. P. 61.  Plaintiff's

allegations of spoliation of evidence have been considered multiple times before, and, just as in

the past, the Court finds them without merit.[20]


CONCLUSION

Accordingly, for the reasons set forth above, the Court denies plaintiff's post-verdict

motions because plaintiff had a full and fair opportunity to litigate his claims, and the jury

appropriately evaluated the evidence, giving due regard to the credibility of witnesses and

documents, and arrived at a reasonable resolution of the case.  Additionally, the Court denies

defendants' motion for judgment as a matter of law as to liability under the FLSA, but grants

defendants' motion to reduce the damages award as follows.  The Court reduces the total jury

award to $6,580.10.  This figure is increased to $11,975.13 to reflect a statutory liquidated

damages award, and further increased to $19,486.82 to include prejudgment interest.

The Clerk is directed to send copies of this Order to the parties either electronically

through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**
Dated:  Brooklyn, New York
     May 12, 2010


/S/  *Cheryl L. Pollak*

Cheryl L. Pollak
United States Magistrate Judge

---

[20]The Court, for instance, addressed plaintiff's claims of spoliation on November 4, 2005, May 26, 2006, and, most recently on July 2, 2008, when the Court denied plaintiff's motion for sanctions for spoliation.  Nothing was presented at trial to suggest that the Court's earlier rulings in this regard were incorrect.